ETHEL PHELPS, RESPONDENT, v. MONTGOMERY WARD AND COMPANY, A CORPORATION, APPELLANT.—107 S. W. (2d) 939.

In the Springfield Court of Appeals. August 2, 1937.

*F. M. Kinder, L. M. Henson* and *J. F. Woody* for appellant.

*L. E. Tedrick* and *Phillips & Phillips* for respondent.

FULBRIGHT, J.—On Sunday, March 22, 1936, defendant had a preparation called Myco-Sheen applied to its wooden floors. It was

furnished by Masury-Young Company, a reputable manufacturer of Boston, Massachusetts, and applied by a competent and qualified representative of the company who did not testify. It was the first application of the preparation upon the defendant's floor. The preparation has not been applied since.

Plaintiff claims that she went into the store between four and five o'clock on Wednesday, March 25, accompanied by her mother; that she went to the piece goods counter, made a purchase and started to the office to pay her bill; that just as she was turning a corner around a table or counter her feet slipped from under her and she fell to the floor. What happened is explained by her in the following language.

"I told my mother to stay there until I went to the office and paid my bill. I turned to go down the aisle, and as I went to turn around the corner table, this foot slipped from under me and my left leg was twisted under me some way and I hit this leg, my right leg. . . . My feet slipped from under me. It seemed there was a slick place there at that corner and my feet went from under me when I started to go around that counter. I was walking at a medium gait. There were skid marks on the floor. Had shoes with medium heels. . . . The substance on the floor where I fell looked like it was greasy and dirty, at least that was what was on the back of my coat. . . . I do not know what the substance was on the floor of the store.. It was right close to the leg of the table, looked like they had gotten too much there and it had not dried. . . . I think this counter that I was going around when I fell came all the way down to the floor. . . . I had not been in the store for a week or two before the accident. On this particular day it looked like the floor had been cleaned up. I have never heard of this Myco-Sheen works. . . . All I know about what was on the floor was what was on my dress, that is what I am judging by. . . . Mr. Lloyd said that they had put the dressing on there on Sunday and it ought to have been dry, and should not have been slick. The floor was slick where I stepped on it and fell."

Mrs. J. F. Higgins, mother of plaintiff, stated: "The spot on her dress looked like black, dirty greasy stuff. It was there after she fell."

N. T. Phelps, husband of plaintiff, stated: "I saw my wife when Mr. Lloyd brought her home. . . . Her dress had a greasy spot on the hip about as long as this pitcher, looked like floor oil or grease. It was not there before she fell. Sent the dress to the cleaner. I have been in the store before and after the accident. I know Mr. Lloyd told me when I came down that he had been afraid that somebody was going to slip up and break their neck on that floor." Mr. Lloyd denied this statement.

Plaintiff further testified that as a result of the fall she sustained an injury to her wrist and leg, and to the sciatic nerve on the left side; that she was in bed for some days, and was not able to use that leg for weeks; that hip still bothers her. It was not injured before and never pained the plaintiff before. She was taken to Brandon Hospital where her right leg and wrist were X-rayed. Three or four days after the injury plaintiff called Dr. J. Elliott Smith, an osteopath, who testified that her injuries were permanent, or that was his opinion.

On the part of defendant the testimony showed that the preparation, Myco-Sheen, which was applied to the floor on Sunday preceding plaintiff's fall, was manufactured by a reputable firm; that the preparation was made of seven different ingredients, gums and oils so blended that the oil penetrates the pores of the wood of the floor and the gums remain on top making the floor non-slip; that the product was in use in twelve thousand buildings and ten thousand stores scattered all over the United States. The preparation is first put on the floor and the floor is then mopped. This is done to clean the floor. The preparation is again applied and all surplus wiped off with a mop, and the floor is ready for use in half hour after the last application. Defendant's evidence further disclosed that between 1500 and 2000 persons visited this store daily during the month of March, or from 4500 to 6000 between the time the Myco-Sheen was applied to the floor and the time when plaintiff fell, and there is no evidence in the record that any of these persons slipped or fell on this floor, or suffered any inconvenience by the use thereof. The floor did not have the appearance of being slick or slippery and many of defendant's employees did not know the preparation had been applied until after the accident; that they afterwards learned about it and discussed it. They also testified that the floor was not slick.

Defendant presents an assignment containing a list of twelve alleged errors which are condensed under ''Points and Authorities'' to ten. We shall consider such assignments properly presented as are decisive of this case. In so doing, we shall first consider the assignment to the effect that the court erred in refusing defendant's demurrer offered at the close of plaintiff's case and at the close of the whole case.

In passing upon the demurrer, it must be borne in mind that all evidence favorable to plaintiff must be accepted as true and that she must be given the benefit of all favorable reasonable inferences that may be drawn therefrom. All evidence contrary thereto must be disregarded. This rule is so firmly established in our jurisprudence that citations are unnecessary.

It is the law that defendant is not to be held as an insurer and that its negligence as charged cannot result from any presumption arising from the mere fact that plaintiff slipped and fell on the floor. [Myers v. Golloday, 104 S. W. (2d) 1007, and cases cited.] But, "the proprietor of a store or similar place of business owes to his patrons the duty to use ordinary care to see that the place to which he has invited them is reasonably safe for use for the purposes for which it was designed and for which customers are invited there." [State ex rel., Elliott's Department Store Co. v. Haid, 330 Mo. 959, 51 S. W. (2d) 1015; Berberet v. Electric Park Amusement Co., 319 Mo. 275, 3 S. W. (2d) 1025, 61 A. L. R. 1269; Oakley v. Richards, 275 Mo. 266, 204 S. W. 505.]

The material part of plaintiff's testimony is set out in our statement of facts, and we shall not burden the opinion with a restatement thereof. By referring to the statement of facts it will be noted that the floor preparation, Myco-Sheen, was applied on Sunday, March 22, prior to plaintiff's alleged injuries on March 25, a lapse of approximately three days from the time of application to the date of the injury, a sufficient length of time, we think, for defendant, by the exercise of ordinary care, to have discovered the dangerous condition of the floor and have remedied such condition in time to have prevented plaintiff's fall and resultant injury. Moreover, the proof shows that Mr. Lloyd, defendant's assistant manager, soon after plaintiff's fall and injury, stated "that he had been afraid that somebody was going to slip up and break their neck on that floor." Mr. Lloyd and Mr. Thomas, manager, were in the store after the application of the floor preparation and up until the time of the injury. Mr. Thomas was there when the application was made.

It appears from plaintiff's testimony that a different condition of the floor existed at the point where she fell to other portions of the floor. "Looked like they had gotten too much there and it had not dried." As plaintiff turned around the corner of the table at this point her feet slipped from under her, skid marks were left on the floor. Plaintiff was walking at a reasonable gait and wore shoes with medium heels. The substance on the floor appeared to be greasy, oily, and dirty, and was close to the leg of the table or counter. Plaintiff had not been in the store for a week or two before her fall and injury, and had no knowledge of the floor preparation or its application. Other portions of the floor did not have the appearance of being slick and there was nothing to warn plaintiff that she was approaching a dangerously slick or slippery spot as she walked around the corner of the table or counter.

The fact that plaintiff's feet slipped from under her was a circumstance indicating slickness of the floor. The skid marks further indicated slickness. The testimony of plaintiff to the effect that

at the point where she fell it "looked like they had gotten too much there and it had not dried," a substance that "looked like it was greasy and dirty," is borne out by the fact that her clothing after the fall was smeared with a dirty looking grease or oil. Plaintiff's mother who was with her, stated: "The spot on her dress looked like black dirty greasy stuff." N. T. Phelps, husband of plaintiff, stated: "Her dress had a greasy spot on the hip about as long as this pitcher. Looked like floor oil or grease." The evidence as above outlined, we think, is sufficient to establish the fact that the floor where plaintiff fell had an excessive amount of an oily, greasy substance, or Myco-Sheen, and was slick.

Defendant did not contend that this grease or oily substance on the floor where plaintiff was injured got there from some unknown source or cause, but specifically denied that such condition existed. Defendant denied that the floor had an excessive amount of grease or oil or Myco-Sheen on it at the place where plaintiff fell, denied that the floor was slick and denied that plaintiff fell as a result of the floor being greasy, oily or slick. There was sharp conflict in the testimony involving the merits of the case. Therefore, a peremptory instruction in behalf of either party would have been improper. [Griffin v. Arney, 12 S. W. (2d) 95.] Furthermore, we shall not invade the province of the jury to pass upon the weight of the testimony or the credibility of the witnesses. [People's Bank of Holcomb v. Pritchard, 79 S. W. (2d) 781; Young v. Wheelock, 64 S. W. (2d) 950; Mick v. Thompson Co., 77 S. W. (2d) 470; Parrent v. Mobile & O. R. Co., 70 S. W. (2d) 1068.] We think the testimony in the case, measured by the rule heretofore announced, was sufficient in every particular to warrant the court in overruling defendant's demurrer to the testimony at the close of plaintiff's case and at the close of the whole case.

Defendant relies largely on the case of Ilgenfritz v. Missouri Power & Light Co. (Mo. Sup.), 101 S. W. (2d) 723. This case, we think, is clearly distinguishable from the case at bar. The Ilgenfritz case involved a floor covered with linoleum, having an appearance of having been recently waxed, and was "shiny and slick looking," readily observed by any one entering thereon. There was no substantial evidence that the part of the floor where plaintiff fell was any slicker than any other part. The instant case involved a wooden floor that did not have the general appearance of being slick or slippery, and was not so, but had a slick spot at the corner of the table or counter where plaintiff fell and where there appeared to be an excessive quantity of a substance that "looked like it was greasy and dirty" that was not proper to leave there. Moreover, it appears from the testimony that the difference in this spot and the rest of the floor was such as would not likely be noticed by persons

walking thereon. The case at bar is one ''where plaintiff had reason to expect a condition of one kind and without warning was met by another.'' There was nothing whatever to indicate to plaintiff, on entering defendant's store, that the floor was slick or slippery. The floor appeared to be clean, not slick or slippery. Many of defendant's employees did not know that the floor preparation had been applied until after plaintiff fell although they had been working on the floor from Monday morning following its application to the date of plaintiff's injuries. The only slick or slippery place on the floor, as disclosed by the testimony, was the place where plaintiff fell, and was distinguishable from the rest of the floor by the presence of a greasy, dirty substance or floor preparation, indicating that too much had been applied and that it had not been properly mopped and had not dried.

We think the Ilgenfritz case, *supra*, the very recent case, Myers v. Golloday, *supra*, and the following cases clearly uphold the conclusions we have reached on the demurrer: Smith v. Sears Roebuck & Co., 84 S. W. (2d) 414; Scott v. Kline's, Inc., 284 S. W. 831; Dagley v. National Cloak & Suit Co., 22 S. W. (2d) 892, 224 Mo. App. 61; Petera v. Railway Exchange Bldg., 42 S. W. (2d) 947; Moore v. Great Atlantic & Pacific Tea Co., 92 S. W. (2d) 912.

Defendant contends that the court erred in excluding testimony offered by the defendant to the effect that no complaint had been made to any of its representatives as to the condition of the floor after it had been treated, and insists that such evidence was admissible and competent to show lack of notice to defendant. In passing upon this assignment, we quote from the testimony of Daniel Lloyd, assistant manager of defendant's store: ''It (referring to the floor) did not appear to be dangerous and slippery to me. *No one has said anything to me about the floor being slippery.*'' Then follow this question and a recital of what happened as disclosed by the record:

''Q. From the time that Myco-Sheen was put on the floor clear down to the present, has any clerk or employee of the company, or has any member of the public, either man, woman or child, ever complained· to you or said anything to you about the floor being slick, or slippery or dangerous on account of being treated with Myco-Sheen or anything else?

''Mr. Phillips: We object to that for the reasons heretofore given.

''The Court: Sustained.

''Mr. Phillips: I will ask the court to instruct Mr. Henson not to continue asking questions that have been ruled against him. And· I further want to object to this argument now as to testimony that has been excluded by the court.

''Mr. Henson: I want to take the pleadings in this case. It is always competent to show notice. Notice to one of the clerks would

not be notice, but notice to the assistant manager or any officer, it is notice to the company. If it is competent to show notice, it is competent for us to show lack of it.

"Mr. Phillips: Since all these remarks are in the record I would like to have a ruling on the objection.

"The Court: The objection will be sustained.

"Mr. Henson: Save our exception.

"We employ about seven regular clerks on the main floor.

"Q. How many clerks do you employ on the mezzanine floor and upper floor?

"Mr. Phillips: Object to that as being immaterial. That is just to encumber the record. This injury didn't occur up there.

"Mr. Henson: You don't know my purpose to start with.

"Mr. Phillips: Maybe you don't either.

"Mr. Henson: I think I do.

"The Court: Go ahead and answer the question.

"Mr. Phillips: Note our exception.

"There are one and two in the furniture department and in the office ad four in the basement.

"Q. From your knowledge of that business, and from your observation and experience there as assistant manager I will get you to state approximately how many people go in and out of that store daily?

"Mr. Phillips: Object to that as being immaterial and tending to prove no issue in this case.

"The Court: If you will confine it, Mr. Henson, to the March time.

"During March there was from 1,500 to 2,000. Approximately that number daily during that week in March. Of course, it will vary.

"Mr. Henson: I now offer to prove by this witness that no complaint has ever been made to him by any clerk, customer or other person, concerning the condition of the floor in the store *since the application of the Myco-Sheen thereto,* and that he has not known of any other instance where a person has fallen on the floor of said store since the application of Myco-Sheen.

"Mr. Phillips: To which we object. The same is incompetent and doesn't tend to prove or disprove any of the issues in this case.

"The Court: Are you confining your question to *since the accident?*

"Mr. Henson: *Yes, since.*

"The Court: The objection will be sustained.

"Mr. Henson: Save an exception."

We think the above excerpts from the record clearly demonstrate the correctness of the court's ruling. The witness Lloyd was permitted to testify that "No one has said anything to me about the

floor being slippery," and we cannot convict the court of error in sustaining objections to the questions following in the form asked, or in sustaining objection to the offer of defendant's testimony as to complaints made or as to persons falling *since the accident*.

Defendant insists that the giving of an instruction permitting the jury to find a fact when there is no evidence in the record upon which to base such finding constitutes reversible error, and levels its criticism against instruction No. P-1, which, it says, permitted the jury to find that the application of Myco-Sheen to defendant's floor caused same to be slick and dangerous to people walking on it, and that defendant knew, or could have known, by the exercise of ordinary care of its condition. Certainly, there is evidence, as we have heretofore pointed out, to support every fact that the jury was permitted to find under this instruction. Defendant insists there is no evidence that the application of Myco-Sheen to defendant's floor caused the same to be slick and dangerous. It is admitted that Myco-Sheen, a floor preparation, was applied by defendant on Sunday before plaintiff's fall. Defendant's assistant Manager Lloyd said, as appears from the testimony of N. T. Phelps: "that he had been afraid that somebody was going to slip up and break their neck on that floor." Phelps further testified: "I know there was grease on her dress, and Lloyd said they put it on there" (meaning the floor). We think there was no error in giving this instruction, and plaintiff has not directed out attention to error in any other instruction given.

Defendant complains of the court's refusal to give instructions 2-d and 4-d. We think this complaint is without merit. Defendant's case was fairly submitted to the jury on its three instructions given by the court without modification. Instruction 2-d is subject to the criticism that it singles out and unduly emphasizes certain testimony, is an improper comment thereon, and is, in part, unsupported by evidence. We think there is no testimony whatever to support the theory that plaintiff's injury was the result of a mere accident or that would in any way justify the giving of instruction 4-d.

Defendant further insists that the court erred in permitting counsel for plaintiff in his closing argument to the jury to state, in effect, "if Montgomery-Ward has to pay a judgment in this case that it can look to the manufacturers of the product, but that Ethel cannot do so." Defendant's counsel at the time objected to the argument whereupon counsel for plaintiff said: "All right, I will withdraw the argument and ask the jury not to consider it." Defendant's counsel then requested the court to rebuke plaintiff's counsel for getting out of the record and making the prejudicial remarks and that plaintiff's counsel be admonished to stay in the record. The court then directed the jury to disregard the remarks of plaintiff's

counsel and directed him to stay within the record. Apparently, this was satisfactory to defendant as no complaint was made to the court for failure to rebuke counsel or for failure to deliver a sufficient rebuke. Since no exception was saved by defendant, we do not think it is now in a position to complain. [Young v. Sinclair Refining Co., 92 S. W. (2d) 995, and cases cited therein; Klohr v. Edwards, 94 S. W. (2d) 99; Herring v. Franklin, 98 S. W. (2d) 619; Pandjiris v. Oliver Cadillac Co., 98 S. W. (2d) 969.]

We now approach the assignment to the effect that the court erred in not setting aside the verdict because it is excessive. The principal injuries of plaintiff as set out in the pleadings are supported by the testimony. In the opinion of the doctor who testified they are permanent. A verdict for $1500 does not seem to us to be excessive. The trial court passed upon this assignment upon a motion for a new trial, and there is nothing to indicate that the verdict was the result of bias and prejudice on the part of the jury. The amount of damages is largely a question for the jury. That body is vested with a large latitude of discretion and its verdict should not be interfered with unless the appellate court can say that it was clearly the result of prejudice, bias, or malice. [Hill v. S. S. Kresge Co., 217 S. W. 997.] Plaintiff sued for $3000. The fact that a verdict for only $1500 was returned by the jury negatives the idea that the jury was actuated by prejudice, passion or malice.

We have carefully examined all the authorities cited by the defendant in support of its various assignments of error, and find nothing therein to justify reversing or remanding this case. The judgment of the trial court is accordingly affirmed. *Allen, P. J.,* and *Smith, J.,* concur.