ALBERTA DAUGHHETTE, RESPONDENT, v. MONTGOMERY WARD & CO., A CORPORATION, APPELLANT.—146 S. W. (2d) 72.

Springfield Court of Appeals. December 14, 1940.

*Henson & Henson* for appellant.

*Tedrick & Tedrick* and *Byron Kearbey* for respondent.

TATLÓW, P. J.—This is an action for personal injuries, based on the alleged negligence of the appellant (defendant below) on account of a fall sustained by respondent (plaintiff below) in defendant's store. The parties will be referred to as plaintiff and defendant.

The charging part of the petition is as follows: ". . . defendant negligently placed upon the floor and the steps of the stairway used by its customers in going from the first to the second floor of its

store, some kind of substance, the name of which is unknown to the plaintiff, which said substance rendered said floor and steps slick and dangerous to persons using same, which condition of said floor and steps was well known to the defendant, its agents, servants and employees, or had existed for such a length of time prior to the date plaintiff received her injuries as hereinafter set out that same could have been known to it by the exercise of ordinary care, in time thereafter, by the exercise of ordinary care, to have remedied same and thus prevented plaintiff's injuries.''

The answer was both a general and special denial.

At the close of all of the evidence in the case the defendant requested the court to direct a verdict in its favor, which the court refused to do, to which the defendant excepted, and has duly appealed the case to this court.

The main assignment of error is that the court refused to direct a verdict in defendant's favor. The plaintiff's evidence to support the action of the court in submitting the case, is as follows:

The plaintiff's testimony as to how the accident occurred is as follows:

''. . . I was carrying the bundle under my left arm and my purse in my right hand. I started to go back downstairs. When I got down to the top of the steps, just as I was fixing to go down the steps—just as I was fixing to step down on the first step, I felt my feet slip—both of them slipped out from under me. First, I went back that way (indicating), then I pitched forward. Then, I tried to catch myself with my right hand. I caught 'hold of the bannister, but I couldn't hold onto it. My weight jerked me loose and I went on down. I had my gloves on and the bannister was slick and I couldn't hold my weight and I went headfirst on down the steps. After I slipped at the top of the steps, I grabbed the bannister with my right hand, but I couldn't hold onto it. My weight jerked me loose. It was the right-hand bannister. I was trying to catch myself. After my hand jerked loose, I just fell head-first on down the steps to the landing below. I slid down the steps to the landing. I believe there was a dozen or more steps but I didn't count them. When I struck the landing down below, I stopped. As I was falling down the steps, I heard someone scream. Then, when I fell down to the bottom of the steps, they run to me and asked me if I was hurt and I says, 'I don't think so, but I want some water.' Then, they started to raise me up. I don't know who it was. They was to my back. Then, I passed out. They put me over on a bed. When I came to, I was on the bed. I did not notice or see any oil or grease or other substances of any kind on the floor there where I slipped and fell, before I fell. I never looked.

''Q. Are you telling the Jury that you slipped, or that you stumbled, or that your feet gave way, or what? A. I slipped.

"Q. Are you positive that your feet slipped on the floor? A. Yes, sir, I seen them slip and I felt them going out from under me.

"Q. Mr. Henson said in his opening statement that you made the statement, the reason you fell it was your own fault, did you say that? A. I might've said, 'my own awkardness.' I don't know whether I did or not. I might've said that.

". . . After I got straightened around, I noticed the shoes that I were wearing that day and these stockings I purchased (that she had put on in the store). It looked to me like there was oil or grease on my shoes and, also, on my stockings.

"Q. About what size place was that on your stocking? A. Oh, I will say it was as big as the palm of my hand.

"Q. Where was that, around the top, or around the ankle? A. About the ankle. There was also a knot on my leg about the same place.

"Q. Where was this knot on your leg? A. It was on my shin, just above the ankle.

"Q. Did you have that knot there before you were injured there? A. No, sir.

"Q. Was it caused from this fall? A. It was bruised from the fall."

On cross examination plaintiff said:

"Q. Tell the jury, now, Mrs. Daughhette, whether there's a rug on the floor there where you say you fell? A. No, sir, not now.

"Q. Well, was there a rug on the floor the day you say you fell up there? A. I ain't saying there were, and I ain't saying there wasn't.

"Q. You gave your deposition in this case, didn't you? A. Yes, sir.

"Q. You testified then there was a rug on the floor, didn't you? A. Well, I thought there was a rug on the floor.

"Q. That's right, and that's what you testified? A. Yes, sir . . ."

She further testified:

"Q. You didn't grab that rail when you started to walk down the steps, did you? A. When I started to fall I did. I slipped from the top of those steps. I fell from the top of the steps.

"Q. And you told them it was your own fault, didn't you? A. I might've said 'my awkardness.' I don't think I said, 'my fault.'

"Q. You gave Mr. McMeen a statement and told them all about what happened, didn't you? A. Absolutely I did not.

"Q. This gentleman sitting here, (indicating)? A. I didn't know how it happened. At the store: Absolutely I didn't give nobody no statement."

On re-direct examination Mrs. Daughhette testified:

"Q. Now, about this rug, you say you don't remember whether there was a rug back there on the floor or not? A. I couldn't say.

"Q. But you do know there was none there at the head of the stairs where you slipped? A. No, sir, there was none at the head of the steps where I slipped at. I never fainted until they raised me up on the floor down there. I did not faint at the head of the stairs and fall down. I fainted after I fell down and they raised me up."

On re-cross examination, she testified:

"Q. But you did testify there was when they took your deposition? You testified then there was a rug up there that lacked about eighteen inches coming up to the top of the steps, didn't you? A. There probably were a rug up there. It's probably been took up.

"Q. You did testify to that, didn't you? A. I said there was a rug back there.

"Q. That's right, you did say that, didn't you? A. Yes, sir.

"Q. And you said it lacked about eighteen inches coming up to the head of the steps? A. I wouldn't say how much it lacked. I said I slipped from the top of the steps.

"Q. When your deposition was taken you said you slipped on this rug at the top of the steps, didn't you? A. Probably I did say that.

"Q. Well, did you say that or not? A. Haven't you got it there?

"THE COURT: Just answer the question.

"A. I don't know, Judge, Your Honor.

"Q. Now, do you know whether there was a rug up there or not? A. There's no rug there now.

"Q. Was there that day? A. I don't know whether there was or not.

"Q. You said there was? A. If I said there was I said it.

"Q. Did you say that in your deposition? A. I might've said it.

"Q. You know whether you did or not, don't you? A. Yes, I know whether I did or not.

"Q. Did you say there was a rug on that floor the day they took your deposition, or didn't you? A. I think I did.

"Q. You know you did, don't you? A. Yes, sir."

### RE-DIRECT EXAMINATION:

"Q. But you know there wasn't any from where you slipped? A. I know there wasn't from where I slipped from."

Mabel Thurston testified:

". . . I was in the Montgomery Ward Store on February 3, 1940, two times. I was in the Montgomery Ward store the first time about nine o'clock—about nine or ten o'clock in the morning. I went up the stairway from the first floor to the second floor to go to the rest room. I went up the east steps to the top floor in order to get to the rest room. That is the same flight of steps that Mrs. Daughhette has just described.

"They were slick. They looked as though they had either been freshly oiled or mopped. . . . I slipped there myself as I came down the steps, but I noticed it and caught the rail. I noticed it just

as I took hold of the rail. . . . I slipped as I came down in the afternoon.

"Q. Were the steps in the same condition that morning as they were in the afternoon? A. Yes, sir, they were.

"Q. What color was the oil or grease, or whatever it was on that stairway? A. Just a dark color like any oiled floor would be. Just a dark, dirty looking color . . . Only this was more damp.

"Q. But you did notice the same oil or grease, or whatever it was, in the morning? A. Yes, I have to watch my step very close on account of my weak ankles.

"Q. Did you see Mrs. Daughhette after she had fallen? A. Yes, sir.

"Q. Did you see anything unusual about her stockings? A. She had a big spot on her ankle. She showed me the spot on her foot and said how she tore her stocking.

"A. She showed me her stocking. She told me she had just put on a new pair of stockings.

"Q. Just tell what you saw on her stocking, if anything? A. There was a grease spot about as big as the palm of your hand down on her ankle.

"Q. Where was that when you saw that? A. Right across from Montgomery-Ward's there. Between there and the drug store.

"Q. About what time did you see that? A. I would say sometime between 2:30 and 3:00 o'clock that afternoon.

"Q. Had you heard at that time that she had fallen and been to the hospital? A. I had just heard it is all.

"Q. You and her were talking about it when she showed you this grease spot, is that right? A. Yes, sir.

CROSS EXAMINATION:

"Q. After you heard about her falling you went up there and slipped yourself? A. I went up there and I slipped.

"Q. You saw it there didn't you? A. Yes, sir.

"Q. Anybody could see it? A. Yes, sir.

"Q. It was perfectly light there? A. Yes, sir.

"Q. And anybody could look down there and they could see the oil and grease down there? A. Yes, sir.

"Q. There was a great big gob of it? A. I didn't say that.

"Q. What did it look like? A. Just like a person would take an oil mop or something. It was slick. I didn't say it was a big spot.

"Q. How big an area did it cover? A. It looked like the whole floor was mopped.

"Q. It was all over the whole floor? A. Yes, sir.

"Q. It was all down the steps, too, wasn't it? Is that right? A. Well, I never paid much attention to the steps. After I noticed

it I watched my step. I took hold of the rail. I did notice it enough to watch.

"Q. After you heard that she slipped up there, you went up there and slipped, too? A. I didn't know which steps she slipped on.

"Q. That was the only bunch of slick steps up there that day, is that right? A. I didn't look on the other side. I don't know whether they were dry or not.

"Q. The rest of the steps you went up were dry and all right, were they? A. No, they were not all dry.

"Q. Did they look as though they had been mopped? A. As though they had been mopped with an oil mop.

"Q. They had oil strowed all over them. A. I didn't say that.

"A. I said they looked like they had been freshly mopped. . . . It looked like an oil mop had been over them."

Plaintiff's husband testified that he saw the pair of shoes she was wearing that day and noticed a little oil or something on the side of her shoe, "kind'a up on the side of the heel like." He was shown the pair of hose she was wearing that day:

"Q. I will get you to tell the Jury if you saw anything on the hose? A. Well, it looked to me like there was a little grease. They was 'purty' well tore up, her hose was.

"Q. Where was this grease on her hose? A. As well as I remember right along about there (indicating).

"Q. About her ankle? A. Just a little above the ankle."

Charles Weaver, the janitor, called by the defendant, testified:

". . . I know the steps that Mrs. Daughhette fell on. They are the steps that lead from the balcony up to the third floor. I swept the store at about nine-thirty. I swept these steps in question, and, also, the floor at the top of the steps. I did not use any kind of floor compound when I swept. I used a straight broom, which was dry. There was nothing on the floor after I got through sweeping and there was nothing on the steps. I swept these steps and floor before Mrs. Daughhette fell. She fell sometime around noon, about two and one-half hours after I swept the floor and steps. The steps and floor were clean and dry. You can see the floor good and the steps good, because there is a 300 watt globe right in the middle of the steps. I have been janitor for about one year and two months. About two months before Mrs. Daughhette fell, I put a compound on, that is made especially for steps and I did not put any oil or grease or anything like that on the stairway or floor at any time. It had been two or three months before that. There wasn't any kind of compound on there at the time she fell."

On cross examination he testified:

"My duty is to clean the floors and put compound on them. The compound that I apply is Myco-seal. It looks like syrup. You apply it to the floor with a brush and it has no color. It is a little darker

than varnish. I swept the steps about two and one-half hours before Mrs. Daughhette fell. I do not sweep the third floor. The furniture man sweeps the third floor.''

This was all of the evidence that the record shows to' sustain the submission of the case.

The defendant called a number of witnesses.

Mr. Nelson Ladd, who lives at Reno, Arkansas, testified:

''. . . There was no rug on the floor and the stairway where she fell was light. . . . I did not see anything on the floor where Mrs. Daughhette fell. After Mrs. Daughhette fell, I went up the steps and I did not see anything on them. . . . I saw Mrs. Daughhette's shoes after she was put to bed and I did not see any oil on them. I looked at the sole of her shoes and they were dry.''

Cecil Hays, one of defendant's clerks, testified:

''. . . I saw Mrs. Daughhette's shoes before they were taken off of her and I did not see anything on them. I heard her make a statement about what caused her to fall. She said, 'I hate this but I guess it can't be helped.' 'My gloves were slick and I lost my balance.' She said it was her own fault.''

Alma Swank, who was not employed by the defendant, testified:

''. . . I know the steps she fell down and I went down the same steps. I went up the steps before she fell. I never paid any particular attention to the steps. I know they are varnished steps. It was light on the steps. I did not notice any oil or grease or any other slick substance on the floor at the head of the stairs. If there was anything on them, I did not see it. . . . I heard Mrs. Daughhette make some statements after she fell. She stated that she had slipped; that she had on her gloves and that if she had taken her gloves off, it would not have happened. She, also, stated that it was her fault.''

Dorothy Ruser, a school teacher, testified:

''. . . She (Mrs. Daughhette) told me that she had on new kid gloves and they were slick and she started to grab the rail and she lost her balance. She, also, stated that it was her own fault or awkardness. I saw the steps where Mrs. Daughhette fell and they did not have any oil on them and looked clean. I went to the hospital with Mrs. Daughhette and when she got ready to leave, a man from Montgomery Ward store brought her shoes out to her. When she started to put her shoes on, she turned them over and looked at them and stated, 'I don't see anything on there to have caused me to fall.' And, I did not see anything on the shoes. There was no oil or grease on them. She put on her shoes and came on back to town and went in Montgomery Ward.''

Ruth Abbott, who worked for the defendant, testified:

''. . . I saw Mrs. Daughhette coming down the steps at the time she fell. I saw her reaching for the rail that goes down the steps. She was on the stair-steps enough that I could see her feet. Mrs.

Daughhette kinda stumbled when she was on the steps and grabbed the rail and just fell down the stairs . . ."

Dr. Lilbourn Qualls, a physician, testified on behalf of the defendant:

". . . I had an occasion to go over to Montgomery Ward store right after Mrs. Daughhette had fallen down the steps. Mr. McMeen, the manager of the store, called me. When I arrived at the store, I found Mrs. Daughhette lying on a bed on the mezzanine floor. Mrs. Daughhette did not complain of any particular pain of any consequence. I advised her to go to the hospital and have an X-ray made to see if there were any fractures. She told me that she fell down the steps. I had a conference with Mrs. Daughhette about what happened and she told me that she was coming down the steps and she went to grab the rail to hold to the rail and she had her gloves on; that her hand slipped on the rail and she lost her balance and fell. She also said that it might have been clumsiness. She told me that in the presence of all the people that were there at the time. We took her to the hospital and X-rayed her. Before I released her from the hospital, one of the employees of Montgomery Ward store brought her shoes out to the hospital. I saw her shoes and there was nothing on her shoes except a little mud on the side and the soles were dry. There was no oil or grease or anything like that on them . . ."

Kenneth Dixon, a salesman on defendant's furniture floor, testified:

". . . She (plaintiff) had to pass directly in front of me to get to the stairway. I heard the lady stumble and I turned around and saw her as she went down. She seemed to go head-long. She grabbed to the right for the rail. I would say that she was on the second or third step from the top when she stumbled. I saw the floor at the top of the steps at that time. The floor was in good condition and there was nothing on it . . ."

Dorsey Maske, a furniture salesman for the defendant, testified:

". . . I wasn't in the store the day when Mrs. Daughhette fell down the steps, but I came in just a few minutes after she fell. I went up the same steps when I went in the store just after Mrs. Daughhette had fallen. The steps were in good condition. There wasn't a thing on the steps. I saw the floor at the top of the steps, and there was nothing on the floor. It was dry and there wasn't anything slick on there."

J. F. McMeen, defendant's store manager, testified:

". . . I saw Mrs. Daughhette the day she fell, but was not in the store at the time. Mrs. Daughhette was lying on a bed in the store when I arrived. I had a conversation with Mrs. Daughhette. I asked her how it happened—how she happened to slip and she just told me that she started to stumble and her gloves were slippery. She said the rail was slippery and she just couldn't catch her balance and she came tumbling down the stairs. She said it was awfully awkard

of her. She, also, stated that she was very sorry it happened. It was just awkwardness that caused her to fall. I examined the stairs immediately after she fell and there was nothing on the steps. There wasn't any king (kind) of compound or any kind of seal on them. They were perfectly clean. There wasn't any oil on them. I examined the floor at the head' of the steps and there wasn't nothing on it. I examined Mrs. Daughhette's shoes when they were in the office for the purpose of protecting myself. There was just a little mud on the side of the shoes. The soles and heels and everything were perfectly dry.''

Mary Raulston, who worked for the defendant, testified:

''. . . I was sitting about five feet from the steps on which she fell, folding circulars. It was on the third floor. There was nothing between the steps and me. I saw Mrs. Daughhette come out of the rest room and noticed her go around the rail and she had some packages in her hand and a purse. I noticed her change the packages from one hand to the other and when she got down to the second or third step, I noticed her reach for the bannister. After that, she just stumbled and fell. She did not stumble or slip at the top. I do not know what caused her to fall. When she started down the steps, she was exchanging the packages in her hand. Her eyes were on the packages, but I do not know whether she watched the steps or not. I noticed the floor at the top of the steps and there was nothing on it. I, also, noticed the steps where she fell and there was nothing on them. I went up and down these same steps quite a few times that day.''

The plaintiff was recalled and denied making the statements, or any of them, which the manager, Mr. McMeen testified that she had made. This was the entire evidence in the case, except as to the character of her injuries.

· The plaintiff relies mainly, if not entirely, upon a recent case of this court. [Phelps v. Montgomery Ward & Co., 231 Mo. App. 595, 107 S. W. (2d) 939.] Counsel for the plaintiff, on the oral argument of the case, stated that he had directed his pleading and his proof so as to bring the instant case within that case, so far as the facts in the instant case would enable him to do so. There is no doubt but what there is a striking resemblance between the facts in that case and the facts in the instant case. There is no doubt, also, but what the Phelps case is a border-line case. The facts there are epitomized on pages 940 and 941 (of 107 S. W. (2d) 939), which it is not necessary to repeat here. This court, in that case, thought the facts there carried the plaintiff's case across the dividing line between submissible and non-submissible cases. After the best consideration that we can give the instant case, it falls just short of reaching the dividing line. The facts that distinguish the instant case from that case are that there the defendant had, on Sunday, March 22, 1936, applied to

his floors Myco-Sheen. The accident occurred on March 25, 1936, between four and five o'clock in the afternoon. The place where plaintiff slipped and fell was definitely fixed by skid marks made by her shoes, close to the leg of the table and "looked like they had gotten too much there." This evidence tended to establish a temporary defect in the floor caused by the application of too much of the substance, which rendered the floor unsafe at that particular point where plaintiff fell. In that case the defect had existed for a sufficient length of time so that the defendant was charged with knowledge thereof and should have corrected it.

In addition to this evidence, the plaintiff's husband testified:

". . . Her dress had a greasy spot on the hip about as long as this pitcher, looked like floor oil or grease. It was not there before she fell. Sent the dress to the cleaner. I have been in the store before and after the accident. I know Mr. Lloyd told me when I came down that he had been afraid that somebody was going to slip up and break their neck on that floor."

Mr. Lloyd denied this statement.

It must be admitted that the evidence was not very strong; nevertheless, this court thought it was substantial enough to make the question of defendant's negligence submissible to the jury.

In this case the particular place where the plaintiff fell is not definitely fixed, as in that case. She furthermore said, "I did not notice or see any oil or grease or other substances or any kind on the floor there where I slipped and fell, before I fell. I never looked." She also admitted that she might have said, immediately following the accident, that, "it was my own awkwardness." She also admitted that, when her deposition was taken she said there was a rug on the floor at the time she slipped. With reference to the statement that the defendant claimed she made at the time of the accident, she said, "I don't know how it happened. At the store: 'Absolutely I didn't give nobody no statement.'"

It the plaintiff made a submissible case it must be based on the testimony of Mabel Thurston, who testified that she was in the store on the day of the accident, both before and after the plaintiff fell. She testified that the floors "looked as though they had either been freshly oiled or mopped. . . . I slipped there myself as I came down the steps, but I noticed it and caught the rail." She did not fall. She said that the floors were "just a dark color like any oiled floor would be. Just a dark, dirty looking color." That the floor looked "just like a person would take an oil mop or something . . . It looked like the whole floor was mopped." That it was all over the whole floor. She also testified that she saw the plaintiff after she fell and that "she showed me the spot on her foot and said how she tore her stocking . . . There was a grease spot about as big as the palm of your hand down on her ankle."

The janitor testified as a witness for the defendant. He said that "about two months before Mrs. Daughhette fell, I put a compound on, that is made especially for steps and I did not put any oil or grease or anything like that on the stairway or floor at any time. It had been two or three months before that. There wasn't any kind of compound on there at the time she fell . . . The compound that I apply is Myco-seal. It looks like syrup. You apply it to the floor with a brush and it has no color. It is a little darker than varnish."

According to the testimony of several witnesses for the defendant, some of whom were employed by the defendant, and some of whom were not, the floor and steps were in perfect condition, and perfectly dry. According to their testimony plaintiff did not slip, either on the floor or on the steps, but, in shifting her packages from one hand to the other, and on account of wearing kid gloves which were very slick, she either lost her balance or stumbled on the steps, causing her to fall. The finding of the jury, of course, is conclusive that she slipped, which caused her accident. Nevertheless, after very carefully reading, considering and reconsidering the evidence, we are unable to find in the record anything more than the opinion of one witness, Mabel Thurston, that the floors looked like an oil mop had been used on them, and that they looked dirty and slippery, and that she, herself, on the day of the accident, actually slipped on the floors (but not at the particular place where the plaintiff's evidence tended to show that she slipped), but did not fall. According to plaintiff's evidence, she slipped just before reaching the stairs that she intended to descend, and, according to the defendant's evidence, she lost her balance or stumbled and fell after she had descended two or three steps.

We do not think that the evidence in the instant case makes a submissible case under the Phelps case *supra,* but, even if it did, we would still be compelled to hold that the plaintiff in the instant case has failed to make a jury case for the reason that the facts in the instant case are even closer to the facts in the case of Cluett v. Union Electric Light & Power Co., 220 S. W. 865, rendered by our Supreme Court. The evidence is set out in full, pages 866, 867. A comparison of the evidence in that case with the evidence in the instant case (which we have set out in full) shows a very close resemblance. Upon the evidence in that case, the court says: ". . . Giving to plaintiff's testimony a latitudinous construction in her behalf, it could mean nothing more than that, in her opinion, the place had been previously mopped and left in a slippery condition. The burden of proof rested upon plaintiff to show by legitimate evidence that defendant's floor, where plaintiff fell, was unsafe at the time and place of accident by reason of its being in a soapy and slippery condition. The evidence necessary to meet this requirement must be something more than mere conjecture."

The Court further says, with reference to her testimony: ". . .

would her mere expression of opinion, or her statement of a legal conclusion, be sufficient to state a cause of action? Clearly not, when tested by the authorities in this state.''

The mere expression of the opinion of the witness, Mabel Thurston, above set forth, does not, in our opinion, make a submissible case under the Cluett case, which case is conclusive on us; so far as we are advised it has never been reversed or modified.

The Cluett case further says: ''. . . Considered with reference to the positive testimony of plaintiff and the porter, heretofore quoted, it would seem more probable to us that plaintiff slipped upon the linoleum while in its normal condition, or possibly on account of the sole of her shoe having become smooth prior to coming in contact with the linoleum.

''It is not for the court, however, to account for the accident by way of speculation . . .''

Paraphrasing the above observation with the facts in the instant case, it will be seen that: Under the plaintiff's own testimony, she did not know how the accident occurred. Moreover, the positive testimony of the several witnesses that she did not slip—but stumbled on the steps as the result of shifting her bundles, and the fact that her gloves were slick, makes the above observation of the court applicable to the instant case.

We are unable to reach any other conclusion than that, on the undisputed evidence in the instant case, the trial court erred in not directing a verdict for the defendant. The case is, therefore, reversed with directions to the trial court to enter a judgment dismissing the plaintiff's case and discharging defendant without day and with its costs. It is so ordered. *Smith* and *Fulbright, JJ.*, concur.