MARGRETTE L. SHREVE, appellant, v. EDMUNDSON ART FOUNDATION, INC., appellee.

No. 47895.

(Reported in 50 N.W.2d 26)

238

November 13, 1951.

Rehearing Denied January 11, 1952.

Guy A. Miller and Denmar Miller, both of Des Moines, for appellant.

Gamble, Read, Howland, Gamble & Riepe, of Des Moines, for appellee.

Mantz, J.—Margrette L. Shreve brought suit for damages against the Edmundson Art Foundation, Inc., alleging that such defendant, in the operation of the art institute in the city of Des Moines, Iowa, was negligent and that by reason of such negligence she was injured. Defendant resisted such claim and alleged that in such operation it was free from negligence and was not liable therefor. The trial court dismissed plaintiff's petition and she has appealed to this court. A more detailed statement of the specific claim which plaintiff urges against defendant, the resistance of defendant and the evidence will be later set forth in this opinion.

About 7:30 p.m., November 4, 1948, Margrette Shreve of Panora, Iowa, and a companion, entered a building in Greenwood Park, Des Moines, Iowa, said building being owned, controlled and operated by the defendant, Edmundson Art Foundation, Inc. It was devoted to and used for various art purposes, such as painting, weaving, pottery, molding, etc. It was open to the public, no admission being charged. As Mrs. Shreve and her companion were walking in one of the halls, or corridors, of such building she slipped and fell to the floor, fracturing her hip. She was taken to the Lutheran Hospital in Des Moines and remained there until March 4, 1949, when she was removed to the home of a daughter in Des Moines and remained there about three months. She was then taken to her home in Panora

and later went to various places. Her injury was serious and painful and permanent in its nature.

I. As heretofore stated the court, at the conclusion of all the evidence and upon motion of the defendant, directed a verdict against the plaintiff and in so doing stated that the evidence failed to show that the defendant was negligent in the operation of the art museum; also that as a charitable institution it was not liable for damages. At the same time, the court entered judgment against the plaintiff for costs. .

Plaintiff in her brief and argument states:

"Two questions are presented by this appeal:

"(1) Is the defendant a charitable institution and, if so, did its status exempt it from liability for this tort? and

"(2) Was there evidence of the defendant's negligence in the record sufficient to take the case to the jury?"

In this opinion we will refer to the Edmundson Art Foundation as the defendant, or the museum.

II. We will take up and consider the last stated question first. If it should appear that the plaintiff has failed to show negligence on the part of the defendant in the particular claimed, then it will not be necessary to pass upon the first question propounded, to wit, as a charitable institution is defendant liable for negligence to plaintiff?

There is little dispute in the evidence. The difficulty arises as to the legal effect of such evidence and the conclusions to be arrived at.

Before we set forth from the record various parts of the evidence which the plaintiff argues were sufficient to take the case to the jury on the question of defendant's negligence, we will briefly set forth some matters which are a background to the matter involved.

The building in question was erected from a bequest by J. D. Edmundson, who, in his will left a large sum of money to be used for a building and its maintenance. It was provided that the building was to be controlled by a board of trustees. It was further provided that the building was to be devoted to art purposes and was to be open to the public with no admission charged.

The trustees picked a site for the building in Greenwood Park, Des Moines, Iowa, a beautiful wooded area in the west part of the city. Construction was begun in 1946 and the building was opened to the public early in the summer of 1949. The cost of the building and landscaping was estimated at approximately two million dollars. The building when constructed was the product of the latest architectural designing, planning and workmanship. The building stands upon a rather high point with drives and walks on the outside. It has the main entrance, a large lobby and lounging rooms; rooms with walls and cases for the display of paintings and other matters usual to such buildings. Provision was made for rooms where various work is carried on—painting, drawing, sculpture, weaving, ceramics, and other lines. Classes in such matters are carried on with teachers employed to instruct. A small charge is made for such instruction.

The board of trustees has general charge of the property. They receive no salaries for their services. They select an art director who directs the activities of the institution. There are from twelve to thirteen employees who do the work connected with the maintenance and operation of the building. The cost of operation is largely paid from a fund derived from the sale of memberships, and public donations.

III. The plaintiff, on November 4, 1948, at about 7:30 p.m., went to the museum to see about enrolling as a pupil in the art school. She had with her a companion, Mrs. Inez Barton, a cousin, of Des Moines. Mrs. Barton was then a pupil in a class in drawing. Plaintiff was then sixty-two years of age. Plaintiff came upon the invitation of Mrs. Barton. They came part way by streetcar and then walked approximately three blocks to the museum. They approached on the east side and used a walk to the south side. There had been a drizzling rain in the afternoon but it had stopped when plaintiff and her companion arrived. There was a doorway leading from the walk into a corridor running south from the main lobby. This corridor led toward the space devoted to the classrooms. When plaintiff and her companion entered the corridor they were on their way to the classrooms. Plaintiff had been in the main part of the building once before. This corridor is quite wide and at a point on the south

end it intersects a corridor running east towards the classroom, the destination of plaintiff and Mrs. Barton. A few feet from the point where the left turn was to be made plaintiff slipped and fell, fracturing her hip. Where she fell was approximately the middle of the corridor. There is no question about the injury. According to her surgeon plaintiff's injury is permanent in its nature.

The floor where plaintiff fell was of cement. The builder of the museum was Arthur H. Neumann, a building contractor for thirty-five years. His company built many of the larger buildings in Des Moines—the Equitable Building, Bankers Life, Telephone Building, Insurance Exchange, and others. He testified that the floors were built and laid in accordance with the plans and specifications prescribed by the architects and that they accepted the floors after they were laid. He testified that he was there frequently while the building was being constructed. A few days before he testified, he had examined the floor at the point where plaintiff fell. We quote from his testimony as shown by the record:

"I was pleased to see that the floor was standing up, that is, that the surface wasn't wearing. I was in the building and all parts of it from time to time, about the time the construction was completed. The floor was as level as it can possibly be made with a trowel. How you get the surface depends on the type of floor specified. In this instance, that specified is top coat wearing surface on top of the concrete base. Your top coat is a rich mixture and there are screens laid on top of the rough concrete and strips that are level. Then you use a straight edge to level off the top coat as it is applied. Then it is allowed to lie there for a while until it starts to set. Then the cement finishers will give it what they call the first troweling. After that, they trowel any defects out of the floor. Then they will go back over it again the second time. Then the final troweling and the third troweling is done just before it becomes too hard so it cannot be troweled any further. It was a hand troweled job. Recently, when I observed it, there was no deterioration or anything of that sort that was observable there from the time it was laid. I couldn't detect any spots in the southerly end of the corridor

that were any different from the balance of the floor. It looked like a uniform floor to me. I didn't get down on my hands and knees and run my hands over it. I walked over it and felt the surface with my feet. I would say the south 15 or 20 feet of that corridor was uniform. I would say that when any material is applied with a trowel it is impossible to get a surface that is just the same all over. It might be that there might be just a little more cement in one spot than another. It is impossible to make it perfect. This was a high type building and therefore called for a very high type floor. It is a finer floor than you would get in the ordinary warehouse or where the floor would have rough use."

Mrs. Barton, as a witness, testified that she was out to the museum a few days before she testified and that she thought the floor to the corridor was the same as on the evening of November 4, 1948: "I didn't notice any difference. We walked together until we got to the end of the corridor. We are both rather swift walkers and we didn't dawdle along. We walked along briskly. She has always walked rapidly with a quick step and so do I. When we were walking down there we didn't walk any differently than we naturally do. There was nothing in particular in connection with the floor that attracted our attention as we were walking down the hall but when we got down to the end of the corridor, I was about one step ahead of her just at the corner, and at that time Mrs. Shreve fell about a foot from the corner. She fell on her left side." An ambulance was called and plaintiff was taken to the Lutheran Hospital. At this point Mrs. Barton testified: "While she was lying there and we were waiting for the ambulance, I made an examination of the place where she fell. I looked to see if there was a leaf or something that she might have slipped on and I didn't find anything but I did notice that the floor was extremely highly slick with wax, much more so than at any other spot."

The above testimony of Mrs. Barton was given on direct examination when she was a witness for plaintiff. On cross-examination, in speaking of the place where plaintiff fell, we find the following:

"Q. Well, were there any places where there was any wax piled up or humped up or anything of that sort? A. It would be piled up on a thicker spot, because there must be a little convex place there. * * * It wasn't heaped up, but it would be slicker because it would be deeper. Q. Well, now, was there any places where you could see the wax either rounded up or in ridges? A. Well, no, not rounded up, but rounded under. Q. Well, were there or not any ridges or mounds where you saw the wax on the floor? A. No, sir, smooth like glass. Q. It was all smooth? A. Yes. * * * Q. Now, if it was all smooth, you couldn't tell what the thickness of that wax was, could you, Mrs. Barton? A. Yes, it has a higher gloss. Q. Oh, just because it has a higher gloss, you tell the jury that there was more wax, is that it? A. I can tell walking down on a polished surface a slicker spot because of the polish, a high polish. Q. Well, then you are basing your testimony that there was more wax in places merely on the fact that you think the floor was a little bit slicker at that point than it may have been somewhere else, is that right? A. Yes, sir."

Plaintiff, as a witness, detailed her movements during the evening immediately preceding her fall: "When we reached the doorway to the corridor, we opened it and went through. Mrs. Barton was a little in front of me. * * * I was a little bit to the right of her. The floor of the corridor which we entered was a cement floor that had been highly polished. It was a sort of a slate gray. I would judge it had wax on. I have used wax on my floors. Q. And this appeared like wax on this corridor floor to you? A. Yes sir. * * * When I went there on the evening of November 4, 1948, I could walk along most of the corridor at an ordinary pace and I had gone very near the corner when we turned to go left to the classroom when I had this accident. * * * I got to that point and was in the act of turning left. * * * My foot slipped. The floor was slippery, very slippery. * * * I fell to the floor and broke my hip."

The place where plaintiff fell had a cement floor. This was hardened at the top and was troweled over to make it smooth. Floor wax was used at all times. A product known as Higgley Hy-Tone wax was used. It is what in the trade is called water emulsion wax. It was used in many public buildings in Des

Moines and elsewhere—the Fleming Building, Equitable Building, Central National Bank Building, Des Moines Building, Hubbell Building. Younkers use it in all their Iowa stores, as do all of the Tangney-McGinn Hotels, Iowa State College and the State University. In the museum the wax is applied about every three months. About every two weeks the surface is gone over with a buffer. Its purpose is to give the floor a sheen. It does not cause the wax to be any slicker or slippery.

Other witnesses testified as to the condition of the corridor floor. There is general agreement that it is a level, polished floor, all waxed—no obvious defects—all is in plain view. The wax used is a standard make and is applied by spreading on the floor, allowing it to dry and then going over it with a buffer. It would seem that the use of wax on floors is so common as to be almost universal. It is used in office buildings, banks, hotels, and educational institutions. It is a well-known fact that it is used in hospitals and in countless homes. Plaintiff knew what it was and used it in her own home. As a matter of fact, plaintiff's argument is based upon the theory that there were spots on the corridor floor; steel trowels had been used, and depressions, rivulets and featheredges appeared. Plaintiff had a witness or two who stated that they got down on their knees and ran a hand over the surface and they felt some slight unevenness. Building experts stated that in using a steel trowel over a cement floor it was next to impossible to get a perfectly flat surface. A witness for plaintiff testified that the troweling is done to make the cement as smooth as is humanly possible. The same witness said that the rivulets are an asset to a floor and do not indicate anything defective in the construction.

As we understand plaintiff, the real basis of her claim is that she fell upon a slippery wax surface. She saw that it was waxed and proceeded ahead. She and her companion were fast walkers and in making a sudden turn she could easily have slipped and fallen.

IV. Plaintiff's status when she entered the museum was that of an invitee. As applied to an invitee, a defendant is not an insurer, but is required to exercise reasonable care and to keep the premises in a reasonably safe condition for the use of those who accept and come upon the premises. Noyes v. Des

Moines Club, 178 Iowa 815, 160 N.W. 215; Nelson v. Smeltzer, 221 Iowa 972, 265 N.W. 924; Osborn v. Klaber Bros., 227 Iowa 105, 287 N.W. 252; Upp v. Darner, 150 Iowa 403, 130 N.W. 409, 32 L. R. A. N.S. 743, Ann. Cas. 1912D 574; Brown v. Davenport Holding Co., 134 Neb. 455, 279 N.W. 161, 118 A.L.R. 423; Ilgenfritz v. Missouri Power & Light Co., 340 Mo. 648, 101 S.W. 2d 723; Kipp v. F. W. Woolworth & Co., 150 App. Div. 283, 134 N.Y. S. 646, appeal dismissed 206 N.Y. 628, 99 N.E. 1109. In 20 R. C. L., section 51, page 55, the rule is set out: "The authorities are entirely agreed upon the proposition that an owner or occupant of lands or buildings who directly or by implication invites or induces others to go thereon or therein owes to such persons a duty to have his premises in a reasonably safe condition and to give warning of latent or concealed perils."

We find nothing in the record to indicate that there were any obstructions in the corridor—any latent or concealed defects. The corridor was wide, was well lighted, the floor was smooth, and to plaintiff everything there was perfectly obvious. She knew the floor had been waxed. Of course, in entering the building as an invitee, plaintiff was required to exercise reasonable care for her own safety. She says that she walked in the corridor and observed the floors—that they seemed all the same —that she saw that it had been waxed and was slick; that she had used wax on her own floors.

The case of Ilgenfritz v. Missouri Power & Light Co., supra, sets forth a situation similar to the case at bar. In that case, plaintiff went into the office of the defendant to pay a light bill. The floor was covered with waxed and polished linoleum. She entered the front door and walked forty to fifty feet over the linoleum to the cashier's desk, paid her bill, and started to leave: When she was about fifteen feet from the desk she fell and was injured. She brought suit for damages claiming that defendant had carelessly and negligently placed upon the floor a large amount of wax, oil or other substance, causing the floor to be dangerous walking thereon, and that such dangerous condition was known or should have been known to defendant. The court dismissed the petition and on appeal the trial court's ruling was affirmed. The evidence showed the waxing of the floor, also that it had some depressions in it due to display of heavy articles,

such as refrigerators, in the space between the door and the office.

The Missouri court, in a rather extended opinion, dealt with the question involved—the duty of the owner of a building towards an invitee, the claim of negligence of maintaining a waxed and polished floor, the unevenness thereof and the duty of an invitee in walking on such a floor. Therein is set forth the quotation above set out from 20 R.C.L., section 51, page 55, with other citations. We quote from the opinion: "Negligence is not proved by such an isolated occurrence. It must be predicated on what should have been anticipated, and not merely on what happened." Page 656 of 340 Mo., page 727 of 101 S.W.2d. (Citing McCollum v. Winnwood Amusement Co., 332 Mo. 779, 59 S.W.2d 693.) Further the court said: "Everyone is familiar with floor wax and its effect upon floors. Everyone knows that a waxed floor must be walked over somewhat differently from a rough floor, and she was required to exercise the reasonable care that anyone could see was required by the circumstances for her own safety. However, whether she was careful or not, or whether her conduct was contributory negligence or not, makes no real difference, because there is no evidence to show that defendant was guilty of any negligence, and even if plaintiff was careful, defendant is only liable if it was negligent. It was not negligent unless there was something on the floor that in the exercise of due care should not have been there. * * * To hold defendant liable here would make it liable as an insurer and not because of negligence." 340 Mo. 657, 101 S.W.2d 728.

The above holding on such matter, and to the same effect, that of State ex rel. Golloday v. Shain, 341 Mo. 889, 110 S.W.2d ·719, was reaffirmed and approved in the case of Lenger v. Modern Recreations, Inc., Mo. App., 203 S.W.2d 100.

Upon the same subject, attention is called to the case of Mautino v. Sutter Hospital Assn., 211 Cal. 556, 560, 296 P. 76, 78. There a nurse, working for a private patient, slipped on the floor of the hospital and was injured. In the lower court the jury found for the plaintiff. Reversed on appeal. In the opinion the court set forth the rules in 20 R.C.L., pages 55–57, and other California cases and then said: "The owner is not an insurer of such persons, even when he has invited them to enter. Nor is

there any presumption of negligence on the part of an owner or occupier merely upon a showing that an injury has been sustained by one while rightfully upon the premises. The true ground of liability is the proprietor's superior knowledge of the perilous instrumentality and the danger therefrom to persons going upon the property. It is when the perilous instrumentality is known to the owner or occupant and not known to the person injured that a recovery is permitted. * * * there is no liability for injuries from dangers that are obvious, or as well known to the person injured as to the owner or occupant." (Citing Goldstein v. Healy, 187 Cal. 206, 201 P. 462, and Shanley v. American Olive Co., 185 Cal. 552, 197 P. 793.)

In the case of J. C. Penney Co. v. Robison, 128 Ohio St. 626, 630, 193 N.E. 401, 403, 100 A. L. R. 705, 708, suit was brought against the Penney Company by one who slipped and fell on an oiled floor in the store operated by Penney. The negligence claimed was the oiling of the floor without warning to the invitee. In its opinion the court set forth the duty of the owner towards an invitee, as found in 2 Cooley on Torts, Third Ed., page 1259, and stated that to such invitee the owner must exercise ordinary care. The court said further: "It must not be lost sight of that under the law the invitee who accepts an invitation owes a reciprocal duty to the invitor while on the invitor's premises to exercise ordinary care to avoid injuring himself. In other words, the acceptance of an invitation, express or implied, does not relieve the invitee of the duty to exercise ordinary care under all the attendant facts and circumstances." Further in its opinion the Ohio court stated (page 633): "We are impressed with the law as announced in the case of Dimarco v. Cupp Grocery Co., 88 Pa. Super. 449, that the mere fact that the proprietor may have oiled the floor from time to time is not of itself proof of negligence and in no manner supplies a deficiency of plaintiff's proof in this respect." (Citing Kipp v. F. W. Woolworth & Co., supra, and Greyhound Lines, Inc. v. Martin, 127 Ohio St. 499, 189 N.E. 244.)

In the Penney Co. case, supra, one of the issues submitted and passed upon was the right of claimant to have the jury pass upon the question involved. In speaking of this matter, the court said at page 634 of 128 Ohio St., page 404 of 193 N.E., page 710

of 100 A.L.R.: "We agree that the right of trial by jury is guaranteed to all citizens by the Constitution of Ohio, and it cannot be invaded or violated by legislative act or judicial decree; but all this does not mean that all cases, regardless of evidentiary aspect, must be submitted to a jury. Under our law it is just as pernicious to submit a case to a jury and permit the jury to speculate with the rights of citizens when no question for the jury is involved as it is to deny to a citizen his trial by jury when he has the right."

The appellant has cited certain cases from the state of Missouri. Some of these are from the intermediate appellate court; the above cited case of Ilgenfritz v. Missouri Power & Light Co. is from the highest court of that state. It still stands. It fully answers the case of Phelps v. Montgomery Ward & Co., 231 Mo. App. 595, 107 S.W.2d 939. In Frazier v. Mace-Ryer Co., 232 Mo. App. 811, 114 S.W.2d 150, the intermediate court recognized the rule as expressed in the Ilgenfritz case, in that the effect of the ruling was that the wax had been negligently applied. Appellant further cited various holdings from intermediate courts in California. None of them ever reached the highest court of California. An examination of the California cases shows that they are not in harmony with the above cited Mautino v. Sutter Hospital Assn., supra. On the question of claimed negligence for falling on waxed floors, the annotation 118 A.L.R. 423, 425, (Brown v. Davenport Holding Co., supra) sets forth the cases from various jurisdictions upon that subject. It will be noted that therein is cited (page 428) the Iowa case of Nelson v. Smeltzer, supra, 221 Iowa 972, 265 N.W. 924.

V. In her brief Mrs. Shreve states that the negligence of defendant consisted in maintaining a floor which in part afforded good footing; that it had spots on the floor different from the rest of the surface, rendering the footing insecure. In the same connection she claims further negligence consisted of waxing and polishing a floor, thus rendering a greater hazard than would have existed if the floor had remained unwaxed. She concludes: "These facts distinguish the case at bar from what is commonly called 'the ordinary waxed floor case.'"

As heretofore stated it must appear that the defendant was negligent in the manner complained of by plaintiff. This court

and courts of many jurisdictions have held that the use of standard water emulsion wax is no evidence of negligence. See Brown v. Davenport Holding Co., Nelson v. Smeltzer, and Osborn v. Klaber Bros., all supra.

There is nothing in the record to indicate that the construction of the floor in the instant case was in any way defective. The record shows that in the construction of the building and the floor in question, care was used to make it conform to standard practices. The floor was level and as smooth as it was possible to make it. Standard materials were used. About every three months a coat of standard water emulsion wax had been applied to the floor in question. It was applied carefully and according to standard practices. The use of such wax is not evidence of negligence where it is properly applied. This is the general rule throughout the country, as shown by the cases collected in Brown v. Davenport Holding Co., supra. This is particularly true of public buildings. However, if it should appear that the wax was not properly applied and left ridges, spots or bumps the rule does apply. No such showing appears in the record; in fact, the record shows just the opposite. Plaintiff argued that at the place where she fell the troweling left what is termed "featheredges"; that such created spots different from the rest of the floor, leaving some depressions which when wet left puddles of water. There was some evidence that when the floors were mopped there was the natural tendency for water to collect in spots. We find nothing in the record to indicate the presence of any depression where plaintiff fell, or that the so-called featheredges, even if shown, created a hazard. As a matter of fact the presence of the so-called featheredges is largely speculative and conjectural. It seems to us that the emphasis which the plaintiff places upon such claimed condition is to avoid the rule which the courts have laid down regarding waxed floors. It seems to us that plaintiff's claim, in essence, is that the floor was slippery and that she observed it, but that her claim of negligence of defendant in that respect must be presented from another angle. There is no evidence that at the time plaintiff was injured there was any water or wet spots on the floor. However, there is some evidence that plaintiff walked about three blocks from the bus to the museum and that it had been drizzling about that time;

consequently her shoes could have been dampened. She and her companion were walking rapidly according to habit. When so walking she made a sudden turn and fell.

Plaintiff testified that she saw that the floor was of cement and that it had been highly polished. She observed this as she walked down the corridor. Mrs. Barton testified that as they entered she looked ahead and saw nothing which might cause one to slip if stepped upon. She says the floor was smooth; that there were no humped-up patches of wax; that the wax was not rounded up but was deeper and rounded under in places; that in such places there must be a little convex place. On cross-examination Mrs. Barton was asked the following question:

"Q. Well, then, you are basing your testimony that there was more wax in places merely on the fact that you think the floor was a little bit slicker at that point than it may have been somewhere else, is that right? A. Yes, sir."

The essence of the testimony of Mrs. Barton is that at the point where plaintiff fell the wax was deeper and was "rounded under" which must have made little convex places and that such made slippery spots.

In the face of this record we hold that the court did not err in refusing to submit the case to the jury. To have done so would have permitted them to act upon speculation and conjecture and any verdict in favor of plaintiff would be without support. In this connection, we call attention to the language of this court in the case of Osborn v. Klaber Bros., supra, at page 109 of 227 Iowa, page 254 of 287 N.W.: "Though it was a most regrettable accident, it appears to us that the evidence was so inadequate, that the question whether defendants caused the floor to be excessively waxed should not have been submitted. Under the record an answer to this question would be so conjectural that it would be outside a jury's proper functioning to pursue the query."

We think the above statement has direct application to the record in this case. There is nothing in the record to show that any other visitors to the museum have been injured while walk-

ing over the floors in said building. Public meetings are held there frequently and many people attend.

Holding as we do, that there was a failure to show any negligence on the part of the museum, we find it unnecessary to consider the other question raised.

The ruling and judgment of the trial court was correct and is affirmed.—Affirmed.

All JUSTICES concur.