MARIE K. DUDLEY,

*Plaintiff and Respondent,*

vs.

MONTGOMERY WARD & CO., Incorporated, a corporation,

*Defendant and Appellant.*

(No. 2388; April 20th, 1948; 192 Pac. 2d. 617)

358

For plaintiff and respondent the cause was submitted on the brief of Kline and Kline and oral argument by Mr. Arthur Kline of Cheyenne, Wyoming.

For defendant and appellant the cause was submitted on the brief of Henderson and Thomson and oral argument by Mr. Harry B. Henderson and Mr. E. Keith Thomson of Cheyenne, Wyoming.

360

362

## OPINION

RINER, Chief Justice.

This was an action brought in the district court of Laramie County by Marie K. Dudley, plaintiff and respondent against Montgomery Ward and Co., Inc., defendant and appellant, to recover damages for personal injuries which she asserts were sustained when she fell on the floor of defendant's store. The case was tried by the court with a jury in attendance. There was a verdict for the plaintiff upon which judgment was duly entered. Defendant's motions for a directed verdict at the close of plaintiff's case and also at the conclusion

of all the evidence in the case, were overruled as was also its motion n. o. v. The proceeding before us is one by direct appeal. The parties will be usually referred to as they were designated in the district court.

Plaintiff's amended petition alleged that she came into defendant's store in order to purchase certain merchandise which was for sale there and that the defendant "had theretofore negligently and carelessly placed upon the floors of its said store a coating of oil, and had negligently and carelessly caused and permitted the floor of its said store near the entrance thereof to be and become slick, slippery, dangerous and unsafe to persons walking thereon; that plaintiff entered said store from the Central Avenue side and had proceeded but a few steps from the entrance thereof when her foot slipped upon said oiled floor and she fell," and suffered injuries; that these injuries were "and are the direct and proximate result of the negligence and carelessness of the defendant, its agents, servants and employees in placing upon said floor and in permitting to remain thereon a large quantity of oil, thus causing said floor at the place where plaintiff slipped and fell to become and be slick, slippery, dangerous and unsafe to the customers of said store, including plaintiff", though it knew, or in the exercise of ordinary care, should have known the floor's unsafe condition.

The defendant's answer denied the alleged negligence aforesaid and claimed that the accident was due to snow and moisture which had been tracked or blown into its store, or to snow and moisture accumulated on plaintiff's shoes, and that the defendant had taken all possible precautions to minimize these dangers to its customers by reason of the storm and winds which prevailed from 7:55 A. M. and continued until 7:20 P. M. on September 27, 1945. It was additionally alleged that the plaintiff's injuries were proximately caused by the

negligence of plaintiff herself in disregarding the wet condition of the floor thus caused, but she, nevertheless, hurried and did not watch "where she was stepping".

Plaintiff's general denial in her reply put the cause at issue.

Responsibility for the accident may be most accurately determined by reciting in substance the testimony submitted by plaintiff and her witnesses on the point involved in the case and that which was uncontroverted and given on behalf of the defendant. Indeed we are obliged to do that under our previous decisions. See Dulaney v. Jensen, 63 Wyo. 313, 181 Pac. 2d 605. Plaintiff is the only witness who related what happened at the time of the accident. No one else seemed to have seen her fall.

Plaintiff herself testified on direct examination that the accident in question occurred in defendant's store in Cheyenne, Wyoming on September 27 about 5:30 P. M.; that at that time it was snowing outside and it was wet, it being dark as she entered the store; that it had been snowing during the day and *there was snow and slush on the sidewalks;* that she went into the store to purchase some dress material which was to be found in the basement; that she had gone about half way between the north entrance to the store on Central Avenue and the basement stairs when her feet suddenly slipped from under her, slipping on the oil and she hit on the right side of her body and face; that her wrist popped and so did her head, as she hit the floor; that she was stunned and there was quite a little while before she could get up; *that when she entered the store she was walking in her usual gait, just a little fast; that her shoes may have been wet but they had no snow on them;* that when she came to, and knew what happened to her, *she noticed a dark spot to her right about six to*

*eight inches long; that this spot appeared to be oil; that it was a dark liquid substance of some kind;* that she does not know what caused her to fall unless there would have been oil on the floor; *that the condition of the floor at the entrance—there was water and slush and it was very slippery and "it was at the point where she fell";* that her right arm was broken at the wrist. She stated also that after the accident, *the right side of her face was half covered with a black substance of oil;* that the nurse at the hospital to which plaintiff was taken by a store employee, cleaned her face when plaintiff requested her to do so and to "wipe the dirt off"; that after the accident her coat had oil on part of it; that the sleeve had oil on it and her gloves had oil on them; that the oil was on the coat perhaps a little bit below the right knee; that the spot was about the size of a dinner plate; that the spot on the sleeve was about an inch wide from elbow to wrist; that there was a large oil spot on the knee of the right side of her dress and several smaller black spots; the spot on the knee was about six or seven inches in diameter; that the coat and dress were cleaned after the accident; that her husband and a Mrs. Smilie saw these clothes after the accident and before they were cleaned; that she saw no warnings that the floor might be slippery or that the floor had been freshly oiled and to watch her step; that the next morning about 10:00 o'clock she came back to the store at the request of the store's assistant manager and told him what her injuries were; that he asked her if she had any idea what made her fall and she replied "no, unless it was the oil she slipped on"; that he said "we do oil the floors but this is supposed to be non-skid"; that she said "this is once it was not non-skid" and that you could see a white streak on the floor where she had slipped; that he said "that is a mark from your heel"; that the floor that morning appeared to have

been mopped but the marks were there where she had slipped.

On cross examination, plaintiff stated that *"your feet would naturally be wet after you come off the street with snow and water"; that there was no snow on her feet at all; that she examined her shoes after her fall;* that the side walk adjacent to defendant's store on Central Avenue was slushy; that it was snowing; that she went from 107 East 21st St. to the Post Office to mail a letter and then to the store; that it was 5:30 when she went into the store and they were preparing to close the store at 6:00 o'clock; that as she opened the door of the store *she saw slush inside the door; that there were quite a lot of wet spots inside the door; that at the point where she fell there was slush and a wet spot there;* that she did not look at the floor for any particular spot only slush; *that she noticed this slush extended to the point where she fell;* that she could not say whether there was a light fixture over the entrance way; that other customers came out of the store as she came in; that she had her purse in her hand; that after she fell she could not look at the rest of the floor around the immediate area of the spot she saw on the floor because she could not turn around, being on her right side; that when she got up she did not look at that area; *that she did not see any other spots that looked to be of this same substance around there;* that there was no depression or raised object on the floor, just a floor with a spot on it; that she had had the shoes she was wearing at the time of the accident over a year and she was not wearing overshoes as she never does; that it was stormy and she picked out an old pair of shoes to wear; that at the time of the accident she was fifty-eight years old; and that the mark of her heel that she saw the day after the accident was lighter than the natural color of the floor; that "you could see the mark through the oil"; *that the eight inch spot she saw*

*was the only oil in the vicinity or that looked like oil;* that she was wearing leather heels on her shoes at the time of the accident.

Plaintiff's husband testified on direct examination that the day after the accident he saw his wife's coat and dress that she had worn at the time of the accident; that the coat had a spot as big as a good sized dinner plate; that rubbing it with his hands it was brown and slimy and had an oily feeling; that he noticed brown spots on the dress; that this was on the inside and outside of the coat; that the sleeve of the coat was "spotted with this oil"; that he noticed a brown spot on the knee of the dress.

On Cross examination he said the coat being black did not show the spot so well "but something had soaked through while she was sitting on the floor"; that the stain on the yellow dress showed a brown spot; on re-direct examination he stated that he has seen oil on clothes and for that reason he said that there was oil in that slime that was on her coat; on re-cross examination he further stated *that he never had the coat examined to determine "for sure" whether it was oil or not.*

Mrs. Smilie, a friend of plaintiff, called at plaintiff's home after the accident, saw the plaintiff about 10:30 P. M. that night and testified that the plaintiff showed to her (Mrs. Smilie) the coat and dress she wore at the time of the accident and Mrs. Smilie said she saw a spot on the coat that looked like oil and a spot on the dress of similar nature.

One Peterson, formerly the assistant manager of defendant's store at the time of the accident but not an employee when he testified, was called for cross examination and stated that he worked in the store at Cheyenne from December, 1944 to the middle of October,

1945; that it was his duty to see to the general maintenance of the store; that the ground floor was treated with a special dressing for wood floors, its trade name being Myco-Sheen; that this was applied once every two weeks; that each time three of four gallons of this dressing was put on the floor; that the Myco-Sheen was poured in small pools probably six or seven inches in diameter in the aisles of the store, *then scrub mops were used to spread this thoroughly over the floor; that there were no spots left any place but it was spread evenly over the entire floor; that at a later time the floor was thoroughly gone over with a dry yarn mop;* that he examined the floor of the store the night of the accident and after it had happened and saw several spots where there was water immediately inside the north entrance on Central Avenue which had evidently been caused by snow melting from the bottoms of customers' shoes entering the store and tracking in snow; that it had been snowing continuously all day and customers brought in snow deposits on their feet.

As a witness for the defendant the official in charge of the weather bureau office in Cheyenne testified that snow fell continuously during the day September 27, 1945 and at 5:30 there was 1.7 inches of snow on the ground, the snow having commenced falling at 7:55 A. M.; that the temperature was below freezing from 8:00 A. M. to 5:30 P. M. and at that time it was twenty-two degrees above zero Fahrenheit.

Defendant's store manager testified that he was present the last time the floor was treated with Myco-Sheen before September 27, 1945; that this was on Saturday, September 22, 1945 after the store closed; that as a part of his duties he inspected the floors of the store; after the Myco-Sheen had been applied there were no spots of oil on the floor; that the yarn brooms used in wiping up the floors after the application of

Myco-Sheen were not dirty; that he left the store at 9:00 A. M. the day of the accident on his vacation; that there is always a certain amount of dark floor near the doorway caused by soot and cinders tracked in which was almost impossible to get off as it grinds into the wood. On cross examination he stated that the store floor was of maple and the treatment with Myco-Sheen was to hold the dust, clean the floor, and prevent floor wear; that he knew nothing of the floor condition between the time he left on vacation and the time of the accident.

Mr. Peterson, who was then, as already indicated, assistant manager of the store and in charge of it at the time of the accident, testified as a witness for the defendant that he was no longer employed by the defendant; that *in maintenance of the floors of the store they were all thoroughly swept with the Myco-Sheen yarn broom at the close of business every day;* that this broom was slightly moist; that he supervised the application of this floor dressing on September 22, 1945 which was done as he described it when he testified before; *that after being thus applied on Saturday, the 22nd, it was allowed to stay on the floor Saturday night and all day Sunday until the following Monday morning at which time the porter of the store went over the floor thoroughly with a dry yarn broom;* that after being placed on the floor it would be three to five minutes before the Myco-Sheen was spread or mopped out; *that on Monday morning after Saturday evening, the 22nd of September, 1945, this witness inspected the floor but found no puddles of liquid;* that the floor had quite a dry appearance; *that approximately two-thirds of the store's customers came through the store entrance that plaintiff used; that before the store opened on September 27 he inspected the floor and found it in clean, safe condition, no evidence of oil on the floors*

*or around the entrance way used by plaintiff;* that in view of weather conditions on that date, he instructed the store porter to keep all entrance ways free of snow or any excessive moisture; that he was to do this as often as necessary even though it meant every twenty or thirty minutes during the day; that he looked not less than four or five times during the day to see that his orders were carried out and found that they were; that he inspected the area where plaintiff fell between five and ten minutes after her fall and there were spots of water and a few pieces of snow that had adhered to the floor from someone's shoes; these spots were from one to two inches in diameter; that he found no spot of oil in the place where the plaintiff fell; that within three or four feet of the place where plaintiff fell, there was a lighting fixture using 500 watt lamps and these were lighted; that he could see the floor surface clearly in that light; that the snow had been removed from the sidewalk in front of the store several times that day but *at the time of the accident there was about* a *quarter of an inch of snow on the sidewalk;* that plaintiff's accident was the only one reported to him that day.

E. E. Stone, the Division Manager of the company manufacturing Myco-Sheen floor dressing testified for the defendant that it is used by approximately 20,000 stores; that he has assisted in applying Myco-Sheen to hundreds of floors over a period of seven years; *that the company's instructions as to the use of Myco-Sheen were followed properly by the defendant's employees; that the component parts of Myco-Sheen were "solvents and gums"; that the solvent is a cleaner and acts to convey the gums into the pores of the wood; that a floor treated with Myco-Sheen is less slippery than an untreated one;* that the gums of the Myco-Sheen make a less slippery surface, and the preparation is a wood

preservative; *that he has had Myco-Sheen on his clothes many times and it is stainless;* that Myco-Sheen applied to the floor of store on September 22, 1945 could not possibly be on the floor on September 27 because the gums deposited would have hardened and *if there had been puddles at the time it was applied, the traffic through the store on the first day after the application would have walked all that off; that in this altitude the floors dry out more quickly;* that the amount of Myco-Sheen used was the proper amount for the area of that floor; *that the Myco-Sheen should be allowed to dry from five to six hours before it would be proper to use the floor; that the color of Myco-Sheen is light amber.* On cross examination this witness stated that the Myco-Sheen during the last seven years has probably been improved; that "we are always working to improve our products".

Edna M. Erbert, a clerk in defendant's store, who had charge of several counters in the front thereof, testified for the defendant that she saw plaintiff after she had fallen; that she (Miss Erbert) was in the defendant's store all day September 27, 1945; that she saw the porter mopping up the floor; *that he did this at the entrance on Central Avenue used by plaintiff as this witness would estimate, with about thirty minutes between moppings.*

We have italicized certain portions of the testimony recited above somewhat at length which seem especially significant in view of the authorities to be presently mentioned.

Keeping in mind the circumstances disclosed by the record as set forth above, we may at the outset of our examination of the law applicable, refer to some general principles which, generally speaking, define the duty which the owner of a store owes to a customer shopping there.

In the first place we may say with assurance of practical unanimity on the part of the courts of the nation, that the store keeper is not to be held as an insurer of the safety of the customer shopping in his store. After announcing this principle, the supreme court of Ohio suggests two other principles which are generally mentioned in the case law involving facts like those at bar. In J. C. Penney Co. vs. Robison, 128 Ohio State 626, 193 N. E. 401 this was said:

"What is the legal relationship between the storekeeper and the customer while shopping in the store? Surely that of invitor and invitee, as between whom the law demands the exercise of ordinary care in view of attendant facts and circumstances.

"The rule is succinctly stated in Cooley on Torts, vol. 2, page 1259 (3d Ed.) viz.: '* * * When he (the owner or lessee) expressly or by implication invites others to come upon his premises, whether for business or for any other purpose, it is his duty to be reasonably sure that he is not inviting them into danger, and to that end he must exercise ordinary care and prudence to render the premises reasonably safe for the visit.'

"This court approved that rule in the case of Cincinati Base Ball Club Co. v. Eno, 112 Ohio St. 175, 147 N. E. 86. We now renew our covenant and again approve that rule.

"It must not be lost sight of that under the law the invitee who accepts an invitation owes a reciprocal duty to the invitor while on the invitor's premises to exercise ordinary care to avoid injuring himself. In other words, the acceptance of an invitation, express or implied, does not relieve the invitee of the duty to exercise ordinary care under all the attendant facts and circumstances."

Many other authorities could readily be supplied to the same effect.

From the plaintiff's charge of negligence against the defendant, as set out in her amended petition quot-

ed above, it would seem that the chief cause of complaint therein is based upon the claim that defendant had negligently "placed upon the floors of its said store a coating of oil" rendering them slippery and dangerous and her brief-work and argument appear to take that line. At the same time another point is suggested, if not so clearly, by plaintiff's pleading, yet it is definitely raised in defendant's answer as hereinbefore noted, viz., the peculiar weather conditions prevalent during the entire business day of September 27, 1945 as they affected the floor near the north entrance of defendant's store on Central Avenue and which the plaintiff used in entering the defendant's premises. It will be remembered that snow fell all day long that day, the temperature was below freezing and about 5:30 P. M., the time of plaintiff's accident, there was a quarter of an inch of snow on the sidewalk just outside of defendant's store despite the fact that its employees had several times during the day at the instance of the assistant store manager, removed the snow in an effort to keep the walk clear of the continually falling moisture.

What duty rests upon a storekeeper relative to his customers as regards store entrances and floors near such entrances when a falling rain or snow renders them wet and slippery as a result of the customers entering from the wet conditions without and tracking in upon the floors the moisture in the form of mud, snow, or water? The following cases and authorities which we shall briefly review make the answer to this query reasonably clear.

In 4 Shearman and Redfield on Negligence (Rev. Ed.) 1826, Section 798 it is said that:

"Water, slush and mud, tracked in upon a floor by reason of weather conditions outside, although it renders

the floor wet, dirty and slippery, does not ordinarily create an actionable situation."

Where in Brunet vs. S. S. Kresge Co., 115 Fed. 2d (C. C. A. 7th Cir.) 713 it was charged that the store owner permitted its stairway to become and remain slippery, wet and in a dangerous condition, there being no charge of defective stairs nor that they were not at all times properly lighted, the facts briefly were that plaintiff and her friend entered defendant's store about 11:45 A. M. to obtain lunch. The store was large and during the noon hour many people came and went. The stairway aforesaid was located a few feet inside the front door. It was snowing on the day of the accident and many people had tracked in slush and snow so that floors and stairs were wet and slippery. The plaintiff and her friend started down the stairs to the basement lunch room; she wore overshoes. She started down the steps and noticing that they were muddy and slippery she took hold of the banister to keep from falling, but upon reaching the fourth or fifth step from the top her foot slipped, she fell to the landing below and sustained severe injuries. The jury awarded her a substantial verdict as damages upon which a judgment was entered.

Reversing this judgment the court remarked:

"It is obvious in the case at bar that nothing was hidden from appellee, that she was well aware of the slippery and wet condition of the stairway as she started to descend it. She stated that she took hold of the banister as she started down because she realized that there was a possibility of falling. She presumed that her own galoshes were wet as she entered the store, having walked through the slush and snow, and she could see that there was slush and snow on the stairs tracked in by other people.

"Appellee sought to prove by the testimony of a number of witnesses who had used the steps about the time of

the accident how dangerously slippery they were, a condition admitted by the assistant manager who stated that he had given orders to the porter shortly before the time of the accident to mop them. There was the positive testimony of that porter that he had mopped them, 'just before I went to lunch * * * around 11:15, between 11:00 and 11:30,' as opposed to the testimony of appellee's witnesses, that the stairs were very slippery, and that two of them, standing right at the foot of the stairs for a half hour before the accident, had not seen anyone mopping them.

"We think the facts as proved by appellee fail to disclose such a lack of reasonable and ordinary care in the maintenance and supervision of the premises as to render appellant liable for her accident. In the words of the Circuit Court of Appeals for the Tenth Circuit in another case involving a fall on rather dark stairs wet from tracked-in water:

"'If what was shown in this case was sufficient to permit recovery, it would require store owners to have a mopper stationed at the doors on rainy days for the sole purpose of mopping up after every customer entering or leaving the premises. Every store owner would be required to be an insurer against such accidents to public invitees who came in on rainy days with wet shoes.'"

See also Sears Roebuck and Co. vs. Johnson, 91 Fed. 2d (C. C. A. Tenth Cir.) 332, a case of similar character in which a like result was reached.

The case of Antenen vs. New York Telephone Co., 271 N. Y. 558, 2 N. E. 2d 693 was one where the Appellate Division of the Supreme Court unanimously affirmed a judgment for plaintiff entered upon a verdict, the action being for personal injuries alleged to have been sustained by plaintiff through defendant's negligence. The reported facts were:

"On March 19, 1932, in entering defendant's building on Henry street in the city of Binghamton to pay a telephone bill, plaintiff slipped on the floor of the vestibule

and fell. There was evidence that it had been snowing and that it was drizzling when plaintiff entered the building, that the pavement and sidewalks were wet and slushy, and that the vestibule floor was wet, dirty, and slippery because of water, slush, and mud, and other substances, tracked into the building by persons entering the same."

This judgment the New York Court of Appeals unanimously reversed on the authority of Miller vs. Gimbel Bros. Inc., 262 N. Y. 107, 186 N. E. 410, an extremely similar case.

In Lander vs. Sears Roebuck and Co., 141 Me. 422, 44 Atl. 2d 886, the trial court directed a verdict for the defendant. The action was one for personal injuries sustained by the plaintiff due to her having fallen on defendant's store floor. Exceptions were taken to this action of the trial court. Stating the material facts involved, the reviewing court put them thus:

"This case, brought forward by plaintiff's exceptions to the direction of a verdict for the defendant, presents the single issue whether a storekeeper is negligent in permitting customers to enter a store, having a floor which becomes slippery when weather conditions are such that water or moisture will be tracked in upon their footwear, without protecting them from the hazard of slipping by the use of mats or other materials under such circumstances or by keeping the floor dry through mopping. A wet floor inevitably results when customers in large numbers enter a store from the street when rain or snow is falling, or the ground outside is covered with melting snow. The facts with which we deal show that the plaintiff slipped and fell in defendant's store in the early afternoon of December 18, 1943, the weather being mild, with snow, ice and slush covering the highways and sidewalks which provided access to the premises. Every customer who entered, including the plaintiff, must have tracked moisture into the store and onto its floor.

"The allegations of negligence concerning which evidence was introduced are that the surface of the floor

at the time the plaintiff was injured was wet, very slippery and unsafe; that it was hazardous whenever water or moisture was permitted to remain thereon;"

Overruling the exceptions filed, the court said in part: "Plaintiff fell on a floor made slippery by water and melting snow and ice tracked thereon by customers entering the premises, as she did, to buy goods. That the floor was wet and slippery must be regarded as established since there is evidence to that effect which a jury might have accepted as true, notwithstanding testimony of opposite effect. There is no evidence however that the floor covering was linoleum or other like smooth material; that it was more slippery than store floors generally under the prevailing weather conditions, or that the defendant or its servants had knowledge of its condition prior to the time of the plaintiff's fall. 'For all that appears' in the evidence, to quote the California court in Neil v. Bank of America National Trust & Savings Association, Cal. App., 104 P. 2d 107, 108, the plaintiff may have tracked into the store the very moisture 'which caused her to slip and fall'."

\*   \*   \*   \*

"No one of the cases (or any other to which we have been cited) goes so far as it would be necessary to go on the instant facts to hold this defendant liable for the injuries suffered by the plaintiff as the direct result of the fall of which she complains. There is no evidence that the defendant knew or should have known that the condition of its floor was hazardous or that any foreign substance, other than that which every customer entering including the plaintiff was tracking in, increased the hazard caused by moisture alone. There is no evidence that the floor was more slippery than it would have been if surfaced with any material standard for use as the flooring in a mercantile establishment in the locality. There is none as to inadequate lighting. (see Judson v. American Railway Express Co., 242 Mass. 269, 136 N. E. 103), faulty construction or improper counter arrangement. The defendant was doing business on a day when the conditions of nature outside and the entry of customers into its store necessarily carried moisture onto the floor. It cannot be said on the

evidence contained in the record that its agents or servants were not exercising reasonable care to guard its customers against any risk which was known to them or should have been foreseen by them. It was proper to direct a verdict for the defendant."

The supreme judicial court of Massachusetts in Grace vs. Jordan Marsh Co. 317 Mass. 632, 59 N. E. 2d 283 had before it these facts: The plaintiff, a customer, was injured in an entrance to the defendant's store. Negligence was charged in plaintiff's pleading in construction and in permitting accumulation of "water and mud and other debris". At the conclusion of plaintiff's opening statement the judge directed a verdict for the defendant and reported the case to the reviewing court. That body assumed the statements of fact both general and specific as made in the statement, were true and would have been upheld by the testimony. The facts to be thus examined were recited as follows:

"On Saturday, December 13, 1941, about 5 p. m. the plaintiff approached the defendant's store at the corner of Washington and Avon streets, Boston. The 'entrance is recessed in back and cuts across, cat-a-corner across that sidewalk * * * (and) sets back a little way, and there are either three or four revolving doors back in that area at least partly covered overhead.' It was raining. There had been 'some snow' the day before, and on the morning of the day in question 'it had snowed and stopped, and then snowed a little more'; at 3 p. m. it rained, and then stopped 'for a very few minutes'; about 3:45 p. m. it 'started in again' and 'rained the rest of the day.' As the plaintiff started into the entrance and 'was about to take her hand' to push the revolving door, 'both feet slipped because of the mud on the entrance, they went out from under her at the same time,' and she fell on her shoulders and the back of her neck and head. 'The place where she fell was muddy and wet, there was a coating of yellow mud.' After her fall the mud was 'all over her hand,' and her stockings and the back of her coat throughout its entire length were 'covered with mud.'"

Holding that the verdict for the defendant was properly directed, the court said:

"The verdict for the defendant was rightly directed. There was nothing to show negligence in construction or in any other respect. There was no statement of expected testimony indicating the omission of any reasonable precaution or disclosing the presence of mud and water in larger quantity or for a greater length of time than was naturally to be expected in the circumstances. The case falls within the authority of numerous decisions." (Citing cases).

See also Leary vs. Jordan Marsh Co. — Mass. —, 77 N. E. 2d 219.

A judgment for the plaintiff affirmed in an intermediate appellate court was reversed in Bersch vs. Holton St. State Bank, 247 Wis. 261, 19 N. W. 2d 175. The facts appearing were: On a day in January shortly after noon, plaintiff entered the defendant bank to make a deposit. It was snowing hard and the pavements were covered with wet snow. Plaintiff slipped on a wet portion of the floor as he approached a desk in the bank lobby and fell, sustaining injuries for which he sought damages. There was testimony, says the court, that:

"customers had been entering the bank since 9:00 a. m. The tiled floor became slippery. An employee of the bank testified that the floor was wet and that he knew of the tendency of that type of floor to become slippery when it was wet.

"The plaintiff testified that the floor was slippery or wet in spots and that he did not notice the spot on which he fell until after the fall.

"The trial court found that the defendant was careless and negligent in allowing the condition to remain on its floors for an unreasonable length of time; that the defendant had actual knowledge of the slippery condition of the floor; and that plaintiff sustained injuries to his person as a result of the defendant's negligence."

In disposing of the case, the court of final authority in the state said:

"In this case, there is testimony to indicate that the bank had notice that the floor was slippery. In time of storm the likelihood of a slippery walk or floor necessarily comes into existence so that even with knowledge that individuals with wet shoes are using the floor, negligence on the part of the defendant in failing to take steps to relieve it, does not necessarily exist. It is considered that under the facts appearing in the record there was no duty resting upon defendant to cause the floor to be kept perfectly dry. It was snowing on that day and customers of the bank could be expected to come in and out of the bank throughout the day. If the defendant were held to the duty of mopping up the floor and keeping it free from snow and water, it would require perpetual attention because there would be a continual deposit of moisture upon the floor. In S. S. Kresge Co. v. Fader, 1927, 116 Ohio St. 718, 158 N. E. 174, 175, 58 A. L. R. 132, the court held that where, during a rainstorm, some water was blown into the front of the store on account of the opening of the door to admit customers; and the incoming shoppers brought in moisture on their clothing and umbrellas so that the floor became damp and slippery, the owner of the store was not liable to a patron who fell on such floor and was thereby injured. The court said: 'It is not the duty of person in control of such buildings to keep a large force of moppers to mop up the rain as fast as it falls or blows in, or is carried in by wet feet or clothing or umbrellas'. When the weather creates a natural hazard of this sort, a person of ordinary care is not under a duty to keep a floor in a public place completely free of such deposits.

"Since defendant has breached no duty, it is guilty of no negligence and hence not liable."

The pleadings in Parson vs. H. L. Green Co. Inc., 233 Ia. 648, 10 N. W. 2d 40 disclosed that plaintiff claimed that she was injured on November 11, 1940 by falling on the stairway leading from the first floor of defendant's store to the basement, these stairs being slippery

and unsafe due to water, slush, snow and mud allowed to collect thereon by defendant's agents and employees which condition was known or should have been known to the defendant. The latter's answer was a general denial.

The record in the case developed these facts: On the Armistice Day above mentioned, the plaintiff left her home about 2:30 P. M. and came to the business section of Des Moines. A storm had commenced about 11:30 A. M., the wind was blowing, snow was falling and practically the entire day was stormy and cold. The streets were slushy and the snow was wet. About 4:30 that afternoon plaintiff went into the entrance of defendant's store. In its front was a stairway starting near the door and leading from the floor on the street level to the basement. Plaintiff after entering the store's front door turned a little to the right and started down these stairs with her hand on the staircase railing. The stairs were of cement with small pieces of tiling in them and were smooth. Plaintiff had a sack of groceries in one hand and her purse in the other. There was proof that these stairs were muddy, slushy and wet and that sufficient snow had packed thereon making them so. Half way down the stairway plaintiff slipped, fell and was injured.

When plaintiff closed her evidence, the defendant moved for a directed verdict on the ground that defendant's negligence was not proven, that the condition of the steps was not shown to be the fault with the knowledge of the defendant a sufficient time before the accident for it to have had opportunity to remedy the condition; and that the evidence disclosed contributory negligence on the part of the plaintiff as a matter of law. This motion the court sustained.

Affirming the action of the court below, the supreme

court of Iowa expressed its view upon the circumstances shown as follows:

"Did defendant exercise the requisite reasonable care to see that the premises were reasonably safe? The only evidence as to the condition of the steps are the statements of plaintiff that "there was water and slush on the steps', and a witness for the plaintiff, Mattie Carter, who testified, 'they looked wet, to me slushy and wet'. But assuming, as does the defendant, that the jury could have found that because of this wet and slushy condition plaintiff slipped and fell, would such condition of the steps constitute negligence? The evidence shows and it is a matter of common knowledge that the Armistice Day storm of 1940 was one of almost unprecedented violence for the season. Wind, cold and snow contributed to unusually severe conditions. Plaintiff had been in the storm engaged in shopping since 2:30 in the afternoon. There was no evidence that the stairway was not well lighted, that it was steep, narrow or otherwise dangerous in its construction, or how long this slush had remained on the steps. In a store open for customers under such weather conditions the tracking in and accumulation of snow and slush cannot be avoided. Such condition is temporary and not a permanent dangerous structural defect as in most of the cases where recovery has been held. We cannot say that a failure to follow and remove immediately every deposit of snow that is brought into a building can reasonably be held to be a breach of duty which the inviter owes to an invitee and so constitutes negligence. Such is not the holding of the courts where this question has arisen. To so require would demand an exercise of such extraordinary care as to be unreasonable.

"Cases cited by defendant sustain this view and follow the general rule as to situations such as are here shown to have existed, temporary in character, and produced by agencies over which the inviter had no control." (Citing authorities).

In Williams vs. Kansas City Terminal Ry. Co., 288 Mo. 11, 231 S. W. 954 where plaintiff slipped and fell on steps in the defendant's railway terminal, these steps being equipped with safety treads supposed to afford a

firm footing even though wet, a judgment for the plaintiff affirmed by the court of appeals was reversed by the supreme court. That court held in substance, to use its language in the McKeighan case infra where the Williams case was cited and interpreted, that:

"the mere likelihood that other persons might create a dangerous condition upon the defendant's premises is material only to charge the defendant with the duty to exercise ordinary care to make an inspection and there is no actionable negligence on the part of defendant unless a dangerous condition in fact existed for such a time as to charge defendant with negligence in failing to remedy it; that, in order to recover, plaintiff had to establish negligence on the part of defendant in failing to remedy the condition; that to establish such negligence it was necessary for plaintiff first to establish a duty upon the part of defendant to remedy the condition and to establish such duty it was necessary for plaintiff to establish both the actual existence of the condition and actual or constructive notice thereof, in time by the exercise of ordinary care to have remedied or warned of it."

The supreme court in the Williams case used the following very pertinent language in support of its final ruling:

"The petition alleges that the step on which plaintiff fell was unsafe because it was 'slippery'. She offered no evidence tending to show that the slipperiness arose from the material of which the step was constructed, or from the manner in which it was constructed, or from its having become worn or out of repair. All the evidence she introduced as to the condition of the step was her testimony that the step was wet, that she could see the tracks of people—mud tracks, she thought—but she could see them plainly, and they were wet. The question submitted to the jury, at her instance, with reference to the step, was whether it was 'wet and slippery'. It is not her contention that she stepped on a piece of mud and slipped, but that she slipped because the step was wet.

"There was no direct evidence as to what caused the step to be wet or as to whether defendants had any knowledge of such condition prior to plaintiff's fall. And no evidence at all as to how long the step had been wet. The stairway was inclosed and under roof; hence not exposed to the weather. However, it had been raining all day, and the inference is that the water on the step came from the wet footwear and dripping raincoats and umbrellas of persons who had gone down the stairway before the plaintiff. If the steps became wet in this manner, they must have done so many times before under like circumstances, and their condition at the time of plaintiff's fall must therefore reasonably have been anticipated by defendants' agents. But, even so, what is it that it was incumbent upon them to do? Respondent's counsel suggest that they should have used a mop or sand. Had plaintiff been the first to go down the steps after the gate was opened she would no doubt have found them dry, but at least a part of the crowd immediately preceded her. The only way defendants could have made the steps dry by the use of mops for all of their passengers would have been to have admitted but one at a time through the gate, and then followed him all the way down, mopping the steps after him. The use of sand would have made the stairway unsightly, and it is not at all certain that it would have been any more efficacious in preventing plaintiff from slipping than the safety tread. But whether it would or not is not decisive of the question under consideration. Defendants were not insurers against all hazard arising from the use of the steps; they were not bound to make them absolutely safe. By equipping them with a safety tread of standard construction, defendant did all, under the circumstances shown by the evidence, that the exercise of ordinary care required, in order to make the steps reasonably safe from the danger of slipping upon them. We hold as a matter of law that plaintiff failed to make a case entitling her to go to the jury."

The doctrine of the Williams case was followed in the much later case of McKeighan vs. Kline's Inc., 339 Mo. 523, 98 S. W. 2d 555. There it appeared that the defendant owned two store buildings with an alley be-

tween and it provided alley entrances to both stores. Plaintiff entered one store, made a purchase, and shortly thereafter left that building, crossed the alley, entered the vestibule or alley entrance of the other building and after taking a step or two, fell on the floor of that store and was injured.

Plaintiff's evidence tended to show that the alley aforesaid was much used by delivery trucks in serving and in parking at the rear of the stores on either side of the defendant's stores; that oil and grease was dropped in the alley in this use and tracked by their wheels; that rain would cause oily, greasy and dirty water to flow down the middle or lowest part of the alley and this was at times tracked into the store entrance in question, especially in wet weather, by customers and persons using the passageway, of whom there were many; that, as the court stated:

"Plaintiff testified that as she crossed the alley she observed its condition; the weather was damp, misty, rainy, and snowing some through the day; there were puddles standing in the alley, and blotch of oil that she avoided; that as she reached the doors of the vestibule no one was ahead of her, except a man who preceded her at a distance the width of the alley; that she pushed and entered by the south or right-hand door; that she took the first step in with her left foot and that, when she took the next step, with her right foot, she 'had the sensation of something under my foot—I stepped in something. * * * Immediately—instantaneously—it slipped out from under me with an angle, with the sensation of sliding through something', and that she went down on the floor in an angling position."

\* \* \* \*

"Plaintiff said that as she opened the alley door and started into the vestibule she looked at the floor and that it had 'an appearance of a dirty, muddy looking cast on the tile, dirty and dark and black looking tracks.' Mrs. Rundus testified that after plaintiff fell and was lying on the floor she noticed that the floor was wet.

The driver of the ambulance by which plaintiff left the building testified on plaintiff's behalf that when plaintiff was put in the ambulance he noticed some dirt or something 'slimy like grease' on plaintiff's dress at her hip, and plaintiff testified that there was grease on the arm and bottom of her coat when she was taken to the hospital."

By defendant's evidence it was shown that the store manager called to attend the plaintiff after the accident, saw to her removal to the rest room and then summoned an ambulance; that the vestibule was cleaned every night; that there was a porter on duty on the first floor during the day who made regular rounds on that floor every hour or so and cleaned it and the vestibule as necessary; that the vestibule floor sloped downward from the alley level to the floor level and was paved with standard non-slip tile which contained carborundum; that on returning from the rest room, he examined the floor where plaintiff's fall occurred but saw no grease, oil or other substance on it. No witness testified to having seen any on that day; there was no direct testimony as to how long before the accident any condition of dirt or other substance had existed on the floor. Upon a jury's verdict a judgment for the plaintiff was entered upon the conclusion of the trial.

After reviewing the evidence as outlined above, the court stated that:

"There was no evidence as to how long the condition of the floor as described by plaintiff and Mrs. Rundus had existed before plaintiff entered the vestibule; and there was no physical evidence that it had existed for any appreciable length of time; and the evidence with respect to the volume of traffic during the busy noon hour was that it was particularly heavy. The burden was on the plaintiff to affirmatively show the length of time the condition had existed and not upon the defendant, and that matter is left wholly to conjecture. Shidloski, v. N. Y., C. & St. L. R. Co., 333 Mo. 1134, 64 S. W. (2d)

259, and cases cited. The undisputed evidence as to the frequency of cleaning has been stated and need not be repeated."

It was then held that defendant's demurrer to the evidence should have been sustained and that as a matter of law, plaintiff had failed to make a case for submission to a jury.

It will be remembered that in the case at bar, plaintiff herself testified that when she came into the defendant's store after having walked in the snow to the Post Office and thence to the store, she had no snow on her shoes but that they may have been wet; that the condition of the floor at the entrance—there was water and slush and it was very slippery; that as she opened the store door she saw slush inside the door and quite a lot of wet spots there; that at the point where she fell there was slush and a wet spot there; that she noticed this slush extended to the point where she fell; that she was walking a little fast when she fell. The uncontroverted evidence of the defendant was that the store manager had given orders to the store porter which the former said he observed were obeyed to keep all entrances of the store free of snow or any excessive moisture as often as was necessary, even though it meant every twenty or thirty minutes during the day and that a clerk in charge of the sales counters near the store entrance in question said she saw the porter mopping the floor at the Central Avenue entrance of the store used by the plaintiff; that she estimated the time between moppings as thirty minutes.

Under these circumstances and the law applicable thereto as we find it announced in the decisions of the able courts examined supra—decisions upon facts in many respects closely analogous to those appearing in the record here—we can not perceive that if it be claimed that plaintiff slipped as a result of the combina-

tion of her wet shoes and the slush and water tracked in by the store's customers, there could be predicated thereon any failure on defendant's part to perform a duty which it owed the plaintiff. Nor could a jury properly find the defendant guilty of negligence in that respect. It can not be the law that under the temporary weather conditions prevalent on September 27, 1945 a storekeeper must at his peril keep his floors absolutely dry or maintain a force of moppers to follow every customer who enters the store. That would be unreasonable and even impossible for most store owners. It would seem decidedly significant in the case before us that although she saw that the defendant's store floor inside the door used by the plaintiff was slippery with slush and water, she walked "a little fast" through it and fell.

But as before stated, the principal ground of negligence advanced by plaintiff is that her accident was due to the carelessness of the defendant and its employees "in placing upon said floor and in permitting to remain thereon, a large quantity of oil" on which she slipped. It does not appear to be pleaded when this "oil" was placed on the floor or how long it had been allowed to remain there.

The cases where persons have slipped on store floors on account of some foreign substance being thereon are many and the courts have formulated certain legal principles that have been applied to govern circumstances of that kind. The following appellate decisions briefly summarized will, we think, afford material help in determining what those principles are. Some of them have been already mentioned in the cases examined supra. It appears well established, it would seem, that a plaintiff may not recover damages incurred through a fall on a store floor without proof that the harmful substance upon which he slipped was put upon the floor

by the owner, or if it got there through another agency, that it had been upon the floor for a sufficient length of time after the defendant had actual or constructive knowledge of it for the storekeeper in the exercise of ordinary care, to have removed it or warned plaintiff.

In J. C. Penney Co. Inc. vs. Robison, 128 Ohio St. 626, 193 N. E. 401 already mentioned, the court itself outlines its holding in this language.

"In an action for personal injury, brought by a customer against a storekeeper, predicated upon the alleged negligence of the storekeeper in oiling and maintaining a floor in such storeroom in a dangerous condition, it is not enough to produce testimony showing that the customer slipped and fell on an oiled floor in such storeroom. There must be testimony tending to show that some negligent act or omission of the storekeeper caused the customer to slip.

"Testimony to the effect that after the customer fell there was a mark on the floor where the customer's heel had slipped, that she had some oil or black substance on her hand, dress, and stockings, and that the rubber tap had come off the heel of the customer's shoe in falling, affords no question for the jury. Considering such testimony in its most favorable light toward the customer, it constitutes no proof of negligence on the part of the storekeeper."

The facts appearing in the case of F. W. Woolworth Co. vs. Williams, 41 Fed. 2d (Ct. App., D. C.) 970 were briefly these:

The action was one for personal injuries incurred by the plaintiff, Grace Williams, through slipping and falling on the store floor of the defendant. There was a judgment for the plaintiff. It appeared, as the opinion states, that:

"the defendant was conducting a 'Five-and-ten-cent' store on Fourteenth street in the city of Washington. About 5:30 o'clock in the evening plaintiff entered the store and, after making a small purchase, was leaving

through one of the aisles when she slipped and fell, breaking her arm. She was the only witness who testified on her behalf as to the cause of the accident. She stated that when she was assisted from the floor to a chair she noticed an oval-shaped spot on the floor at about the point where she fell; that the spot was darker than the floor; that it was slightly raised above the floor, and that she had no doubt but that her heel went into this spot and caused her to slip."

\* \* \* \*

"The manager and assistant manager of the store and two clerks testified in substance that they examined the floor within a few minutes after the accident and that they found the floor to be clean; that there was no trash, soap, or grease of any kind on the floor."

The charge of negligence was that the defendant:

"allowed and permitted some greasy, slimy, oily, or other like foreign substance to be and remain upon said floor, and did fail to remove and clear said floor of said substance so as to remove danger to plaintiff and other persons of slipping and falling on said floor by reason of the presence of said substance thereon."

Reversing the judgment of the trial court, Mr. Justice Van Orsdel, formerly a member of this court, said in part:

"Conceding that defendant observed the spot on the floor immediately following the accident, this is not sufficient in itself to establish her case. Plaintiff made no attempt to show how or by whom the spot was created, or how long it had existed. It may have been occasioned by some other customer, having no connection with the defendant, dropping or spilling something on the floor. This well might be, considering the fact that the evidence shows that the floor had been swept only a few minutes prior to the accident. Plaintiff cannot sustain her case by merely showing that a spot was there. The burden rests upon her to establish its presence under circumstances which would charge defendant with responsibility therefor. This she failed to do, but rested her case solely on the existence of the spot on the floor."

It will be observed that in several quite material respects, this case resembles the case at bar.

Reay vs. Montgomery Ward and Co., Inc., 154 Pa. Super. Ct. 119, 35 Atl. 2d 558 was an action against the defendant company by the administrator of the estate of Annette Reay for the death of plaintiff's intestate as the result of a fall caused by an oily or greasy substance on the floor of defendant's store. The plaintiff had judgment on a jury's verdict. The opinion states the facts in this wise:

"Annette Reay, a customer in defendant's store, fell to the floor of the aisle and sprained her ankle. By the verdict in favor of plaintiff it is established that she slipped on an oily or greasy substance and that her fall aggravated an existing malady which caused her death. The evidence as a whole together with all inferences favorable to plaintiff does not charge defendant with negligence. For this reason there is error in the refusal of the court to enter judgment for defendant n. o. v.

"Decedent was accompanied by her daughter who was the only witness to the accident. The daughter testified that the floor of the aisle was uniformly dark in color; that on it, unobserved by either of them before the accident, there was a spot of oil or grease one-eighth of an inch thick and one foot in diameter which caused her mother to lose her footing when she stepped upon it."

Reversing the judgment and directing one to be entered for the defendant n. o. v., the court stated that:

"No inference favorable to plaintiff flows from the fact that there was a greasy substance on the floor or that the injury was caused by it. Dickey v. Boggs & Buhl, Inc., et al., 345 Pa. 453, 29 A. 2d 1. The mere happening of an accident does not charge a defendant with liability; res ipsa loquitur has no application. It was for plaintiff to prove some specific default or, at least, existing conditions which raised an inference of negligence as an indispensable basis of recovery. Chapman v. Clothier, 274 Pa. 394, 118 A. 356. Defendant was not an insurer of the safety of its patrons and the

dangerous condition of the floor in itself did not charge it with negligence. There is nothing in the evidence indicating the source of the greasy substance or that defendant was in any way responsible for its presence. Defendant did not have actual knowledge of the oil or grease in the aisle and there is no evidence that it was there for any period of time prior to the accident. Defendant therefore is not chargeable with constructive notice of its existence, imposing liability for negligence in failing to remove it. In the absence of testimony that the slippery substance had been on the floor long enough for the defendant, through its representatives or employees, to have known of it, proof of negligence is lacking and there can be no recovery." (Citing authorities).

The case of Filipowicz vs. S. S. Kresge Co., 281 Mich. 90, 274 N. W. 721 presented this situation: While going from the second to the first floor of defendant's store on a public stairway between 9 and 10 A. M., Ida Filipowicz slipped and fell sustaining a fractured wrist. After receiving first aid treatment for the injury, she left the store and when she arrived on the street discovered that her dress, underskirt, and stockings were all greasy and black. She brought action against the store owner for injuries incurred. On direct examination she stated that she had slipped on some grease and told the trial judge in response to his query that the stairway step felt as though it was slippery.

At the close of plaintiff's testimony, the defendant moved for a directed verdict upon the theory:

"that plaintiff had failed to show the existence of a dangerous or defective condition caused by defendant's negligence or that it knew or should have known of such condition, and that plaintiff was guilty of negligence in failing to pay attention to her own surroundings."

This motion was denied. There was proof on behalf of the defendant that after the accident no grease was

found on the floor; that a maid swept the stairs when any refuse was found, inspection being made every fifteen or twenty minutes and the stairs were washed by the store porter every night. The defendant renewed its motion at the close of the proofs and this motion was again denied as were motions for judgment n. o. v. and a new trial after judgment had been entered on a jury's verdict for the plaintiff.

After reviewing the evidence before it as well as previous decisions of the court and distinguishing the case of Galarno vs. Great Atlantic and Pacific Tea Co., 260 Mich. 113, 244 N. W. 250 cited to us by plaintiff and relied upon by her in the case at bar, the opinion concludes with this language:

"Applying the foregoing to the facts in this appeal, there is no evidence of how the grease got upon the stairway nor that defendant had knowledge of its presence, nor that it was on the steps long enough so that its employees should have known of it.

"The testimony in the instant record in insufficient to carry the question of defendant's negligence to the jury, and although we have viewed plaintiff's testimony most favorably to her, she did not prove actionable negligence and a verdict should have been directed for defendant .

"The judgment is reversed and the cause remanded for the entry of judgment in favor of defendant."

The case of DeBaca vs. Kahn, 49 N. M. 225, 161 Pac. 2d 630 was one for personal injuries sustained by plaintiff, the wife of the other plaintiff, her husband, from a fall in the store of the defendant doing business as Kahn's Shoe Store. It was claimed that the defendant was negligent in that the store floor had been oiled on the night previous to the accident and that the surface had been left wet, slick, and slippery and in a dangerous condition to walk upon; that plaintiff wife's

injuries were due approximately to the defendant's carelessness in this respect and that defendant knew or by the exercise of reasonable care should have known of this condition.

The plaintiff wife as in the case at bar was the only witness on behalf of the plaintiffs who testified as to what occurred at the time of the accident in question or as to the condition of the defendant's store. She stated in substance as the court says:

"That she entered the defendant's store on February 20, 1943, to pay a bill; that as she walked across the floor she slipped and fell and that when she got up she noticed that her stocking was all torn up and full of oil, and that the part of her coat where she fell was likewise full of oil; that she inquired from Henry Ballin, who came to her assistance, if someone had oiled the floor, that he answered no, but that Mrs. Kahn had waxed the floor the night previous to the accident. On being later recalled, she testified there was oil on the floor but could not say whether it was fresh, that it was all black and "kind of" fresh where she fell, because she got full of oil that the oil had penetrated through her stocking and marked the skin of her leg. On cross-examination she testified it was just a big wet spot where she fell but was unable otherwise to describe it. The plaintiff's daughter, Mrs. Margaret Sena, testified that about 5:30 that evening she examined her mother's clothes, that the left stocking was badly torn and that there was oil on both the stocking and the coat."

For the defendant there was evidence from a number of witnesses including the defendant that the floor had not been oiled for the last two and a half months prior to the accident and that then a special floor dressing, non-viscous in character was used; that this was spread evening with mops; that thereafter dry mops were used on the floor and the floor had been perfectly dry the next morning; that it was dry when plaintiff fell; that wax was never used on the floor. The case was tried to the court and the latter found that the floor had been

oiled prior to plaintiff's wife's fall and the surface had been left "wet, slick, and slippery and in a dangerous condition to walk upon and was in that condition at the time of said fall" and that the defendant was liable for the injuries caused by the wife's fall. A judgment for the plaintiffs was given.

After reviewing the evidence, the trial court's findings and conclusions, and many authorities discussing situations similar to that presented, the reviewing court held that:

"The fact that plaintiff slipped and fell on the floor does not, of itself, tend to prove that the surface over which she was walking was dangerously unfit for the purpose."

and then said:

"The undisputed evidence shows that the floor had been oiled approximately seventy days before the accident occurred. The statement of the plaintiff that when she fell her stocking and coat were soiled by the oil she fell on, does not sustain the allegation that the floor had been carelessly and negligently oiled. There is no testimony to the effect that the oil, which the plaintiff saw on the floor after she fell, was placed there by the defendant or his employees, unless, indeed, we assume it to be one of the spots placed on the floor some seventy days prior thereto, and this seems out of the range of reasonable probability, when we consider that the place where plaintiff fell was swept and mopped with a dry mop daily, including the day of the accident, and that hundreds of people had walked on the floor since the last oiling without slipping."

The judgment of the trial court was reversed and the cause remanded with directions that judgment be entered for the defendant.

In Waller vs. Northern Pacific Terminal Co., 178 Ore. 274, 166 Pac. 2d 488, the court declared that:

"The rule is firmly established that where plaintiff slips

upon an object upon the premises of the defendant, plaintiff must, in order to establish liability, show that the defendant or his agent put the dangerous object there, or that they knew or by the exercise of reasonable diligence could have known that it was there and failed to exercise diligence to remove it." (Citing cases).

Pratt vs. Great Atlantic and Pacific Tea Co., 218 N. C. 732, 12 S. E. 2d 242, was an action for personal injuries incurred by plaintiff when she slipped and fell in defendant's store. She alleged her fall was due to the defendant's negligence in permitting a greasy, oily substance to be and remain on the floor near its meat market department. A non-suit on defendant's motion was granted and judgment entered for it. Affirming this ruling, the appellate court said this:

"The plaintiff testified that after her fall she observed the place where she fell. The area covered by the foreign substance was about 10 inches long and 7 or 8 inches wide. There was a mark across it made by her shoes. She further testified that 'it looked greasy and dusty and dirty. * * * It looked dusty and dirty like it had been swept over—dusty and dirty. * * * It looked dark and dusty. * * * It looked greasy and dusty. * * * It looked like it was dust over a dirty spot. * * * It looked greasy'. This testimony is merely descriptive. She does not say, nor did she undertake to show, what the substance on the floor was, who put it there, or how long it had been there. No attempt is made to show how nor by whom the oily spot was created, nor as to how long it had existed."

To the same effect as the case just preceding are the decisions in Roseberg vs. Montgomery Ward and Co., 110 Mont. 154, 99 Pac. 2d 979; Potter vs. Glosser Bros. Department Store Inc., 146 Pa. Super. Ct. 129, 22 Atl. 2d 28.

In O'Brien vs. H. L. Green Co., 128 Conn. 68, 20 Atl. 2d 411 there was a judgment upon a verdict for the

plaintiff which the appellate court reversed, the action being one for personal injuries alleged to have been caused by a fall in defendant's store due to a slippery floor condition. Plaintiff testified that after her fall she saw on the floor a round greasy spot eighteen inches to two feet in diameter; that she saw two marks on the floor where her feet had slipped about two feet long. The testimony established that the defendant some days before had used a dressing upon the floor but all the evidence offered as to this floor dressing was to the effect that it would not make the floor slippery. It was held that if the jury disregarded this testimony they would not be justified in finding that the opposite was true and the supreme court of errors continued its discussion to say that:

"Evidently recognizing this situation, the plaintiff in her brief places her claim upon the ground that the jury could properly have found that the floor was rendered slippery by a combination of a gummy residue left from the floor dressing with dirt, moisture and slush tracked in by customers entering the store from outside. But to make this a basis of recovery it was incumbent upon the plaintiff to prove that the slippery condition had existed for such a length of time that the employees in the store should, in the exercise of due care, have discovered it in time to have remedied it. Newell v. K. & D. Jewelry Co., Inc., 119 Conn. 332, 334, 176 A. 405; Hall v. Great Atlantic & Pacific Tea Co., 115 Conn. 698, 160 A. 302; Laflin v. Lomas & Nettleton Co., 127 Conn. 61, 64, 13 A. 2d 760. There is no evidence directly showing, nor any which would afford the basis for a reasonable inference by the jury, that this condition had been satisfied. Without proof of it, the plaintiff was not entitled to recover and the verdict should have been set aside."

See also Uelentrup vs. Switzerland Stores Co., Inc., 164 S. W. 2d (Mo. App.) 650; F. W. Woolworth Co. vs. Ney, — Ala. —, 194 So. 667; Jakel vs. Brockelman Bros. Inc., 91 N. H. 453, 21 Atl. 2d 155; Powell vs. L.

Feibleman & Co., Inc., — La. App. —, 187 So. 130; Evans vs. S. S. Kresge Co., 290 Mich. 698, 291 N. W. 191; Torbet vs. F. W. Woolworth Co., 59 S. Dak. 47, 238 N. W. 140; Whynaught vs. S. S. Kresge Co. 319 Mass. 729, 67 N. E. 2d 753.

Our attention has been directed by the plaintiff to two cases in which the floor dressing, Myco-Sheen, was applied to store floors and customers have slipped and fallen, suffered injuries, and have been allowed to recover damages. The case of O'Connor vs. J. C. Penney Co., 211 Minn. 602, 2 N. W. 2d 419 was one of these and it appears therein that there was a verdict for the plaintiff but the trial judge disagreed with the result thus reached and granted defendant's motion for judgment n. o. v. Upon plaintiff's appeal, the trial court's action was held error and the judgment was reversed. One of the justices dissented. The case was decided January 23, 1942. There was proof, as the appellate court thought that the Myco-Sheen floor dressing had not been applied in accordance with the manufacturer's directions as to its use and this fact plus plaintiff's testimony that the floor was slippery where she fell made a question of fact for the jury whether the floor dressing had been properly applied even though the application had been made some two months before. In the case at bar the proof is undisputed that the manufacturer's instructions as to the proper use of the floor preparation aforesaid had been precisely followed. Moreover, there was no testimony in that case as there is in the case at bar that she noticed that the slush extended to the point where she fell and that it was "very slippery" there.

The other cited case is Phelps vs. Montgomery Ward and Co., 231 Mo. App. 595, 107 S. W. 2d 939. It appeared there that on Sunday, March 22, 1936, the defendant had Myco-Sheen applied to its floors by a re-

presentative of its manufacturer. This was the first application of this preparation upon defendant's floor. In this connection it may be noted that the dressing seems to have been applied in a quite different manner from that employed in the case at bar. In the Phelps case, the testimony was that floor dressing was put on twice, one application immediately following the other, and the floor was considered ready for use in half an hour after the last application. Plaintiff fell on this floor on Wednesday following the two applications of the floor dressing as stated above, was injured, the jury gave a verdict in her favor and the judgment entered thereon was upheld on review August 2, 1937.

Some three years later the same appellate court in Daughhette vs. Montgomery Ward and Co., 236 Mo. App. 218, 146 S. W. 2d 72 said concerning the case last mentioned "there is no doubt but what there is a striking resemblance between the facts in that case and the facts in the instant (Daughhette) case. There is no doubt also but what the Phelps case is a borderline case." The court further thereafter remarked concerning the Phelps case "It must be admitted that the evidence was not very strong." In the Daughhette case, a verdict for the plaintiff and judgment in her favor was reversed "with directions to the trial court to enter a judgment dismissing the plaintiff's case."

In the still later and also somewhat similar case of Lenger vs. Modern Recreations Inc., 203 S. W. 2d 100, (decided April 30, 1947), the same court again declined to follow the Phelps case though relied on by plaintiff who had obtained a judgment in her favor for personal injuries incurred through slipping and falling on a waxed floor in defendant's place of business, distinguishing the Phelps case from the Lenger case and ordering the reversal of the judgment below. The court pointed out that it was not proven in the Lenger case

that as said in the Phelps opinion "there was nothing to warn plaintiff she was approaching a dangerous, slick or slippery spot". The plaintiff was warned in the case at bar by a slushy, wet, slippery floor which she herself said she noticed extended to the point where she fell.

However, in Stanco vs. H. L. Green & Co., 127 Conn. 422, 17 Atl. 2d 512 the facts were that the defendant operated a department store in Waterbury. During the evening of July 2, 1938 its employees applied Myco-Sheen to the store floor for the purpose of cleaning and preserving it. The store remained closed until the morning of July 5, 1938. Half an hour later, the plaintiff, Nancy Stanco, walked over this floor as an invitee customer of the store, fell and was injured. There was a verdict and judgment for the defendant which the supreme court of errors upheld. The case has many circumstances in it resembling those of the case at bar, especially as respects the method used by the defendant in applying the floor dressing and allowing it to dry during the lapse of some thirty-six hours.

So Montgomery Ward and Co. vs. Windham, 195 Miss. 848, 16 So. 2d 622 supplies another instance where Myco-Sheen was used as a floor dressing. There also the action was one for personal injuries claimed by the plaintiff, Viola Windham, to have been incurred by her as a result of a fall caused by the negligence of the defendant storekeeper in maintaining its store floor. There was a verdict and judgment for the plaintiff. Her testimony regarding the accident was briefly that while walking along an aisle to the street door of defendant's store "she stepped into a pool or spot of oil on the floor", slipped, fell, and was injured; that the spot was slippery and looked like it was oily, probably larger than a hat. Her daughter who was with the plaintiff stated that the substance on the floor "looked

like it was some kind of oil", that had just been put down and it was still wet.

The assistant manager of the store testified that this preparation was used for cleaning the store floors, was known as Myco-Sheen and that it contained no oil or grease whatsoever; that it had the effect of preserving floors from being slick; that a great many large establishments were using it for that reason. The janitor of the store testified that the last time he had put any cleaning substance on the floor was on June 2 before the accident on June 27.

The representative of the manufacturers of Myco-Sheen testified that the preparation has two ingredients, one a solvent which dissolves and removes dirt, oil, grease and other foreign substances from floors; the other is a gum which penetrates the pores of the wood, seals the floors giving them the right color and leaving a non-slip surface; that it contains no oil or grease or wax whatsoever.

The judgment was reversed, one member of the court dissenting. The circumstances of the accident in the case last cited as well as the testimony of the assistant manager and of the representative of the manufacturer of the floor dressing may be instructively compared with that of the assistant manager and representative of the Myco-Sheen manufacturer in the case now before us. The case was decided in 1944 and it will be recalled that the testimony here is that the manufacturer of the floor dressing had probably improved it as there was a constant effort made to improve the manufacturer's product.

Again the two cases of Wetmore vs. McLellan Stores Co., 315 Mass. 443, 53 N. E. 2d 95 (Decided February 1, 1944) were tort actions in one of which the wife of the plaintiff in the other case sued the store owner for

damages for personal injuries sustained as the result of a fall allegedly occasioned by the negligent application to the defendant's floor of oil or of an oily preparation. The husband sued for consequential damages. The jury returned a verdict for the plaintiff in each case. Leave was reserved to enter verdicts for the defendant. The defendant filed motions that verdicts be entered in accordance with the leave reserved. These motions were allowed by the judge subject to exceptions on the part of the plaintiffs. The only question presented in each case was "whether there was evidence to warrant a verdict for the plaintiff."

All the testimony was given by witnesses called by the plaintiffs. The wife's testimony was that the accident occurred on a clear, dry day between 4 and 5 P. M.; that as she walked from the meat counter to the one for notions, to use the concise language of the opinion in reviewing her testimony, and that of the store manager and his assistant:

"She skidded like a 'figure S' and fell. She 'saw the mark where she skidded from and the oil was raised up, just the other side of it was thick with oil; * * * it was clean where her heel had gone'. The mark, which was made by her right foot, was about three feet long and S shaped. It was the only mark on the floor, was white in color, while the rest of the floor was dark or black. She did not notice whether the floor throughout was dark in color. She 'just noticed the black part of it, that it was oiled * * * she did not observe oil anywhere near except the spot where the accident was * * * the space all around there was very dark with oil.' This space was four or five feet square. When the plaintiff got up her hand was greasy, and the right side of her coat had oil on it, was 'kind of black'. The substance on which she fell was not a light or amber color, but was very dark, not as black as ink, but blackish looking.

"The store manager testified that it was a hardwood floor, not varnished, shellacked, or oiled, but treated

with a floor dressing 'which is not supposed to be an oil dressing'. The dressing was applied every two, three, or four weeks, on Saturday nights after the store was closed so as to be dry by Monday morning. It was an amber colored fluid poured from an ordinary sprinkling can and spread with a mop so that it would soak into the floor. A white substance known as feldspar was put on to make sure that it was not slippery. The wood in the floor is a dark color from constant usage. The floor was never washed but only swept, and no soap or lye preparation was used. The accident occurred on a Wednesday, and the last application of the floor dressing was either the preceding Saturday or the Saturday before that.

"The assistant store manager testified that the dressing was called Myco-Sheen, and that he did not know whether it was oily. The amount of fluid that fell on the floor might depend in some little degree on the speed of the man who walked along with the can. After the dressing was applied, a powder was put on as a precautionary measure, 'just in case', but it was used more as a dryer to help it dry fast. The dressing was quite damp when first put on, and the man with the mop had no trouble pushing it along. This would spread the substance, which would then soak into the floor. 'It naturally oils in front of him'."

Overruling plaintiffs' exceptions, the court said:

"On this evidence, the defendant cannot be found to have been negligent. While it is true that the plaintiff observed what she described as oil at the point where she fell, this is not a description of anything disclosed by the testimony to have been put on the floor by the defendant. The only treatment of the floor by the defendant was the repeated application of an amber colored dressing, which was not shown to have been oily, followed by the application of a powder, both as a precautionary measure and as a dryer. There is no evidence, except the description of the floor, as to how long the condition described had existed. See Cheetham v. Crescent Gardens Operating Co., 311 Mass. 320, 321, 41 N. E. 2d 4, and cases cited. It could not have been found that the defendant knew, or in the exercise of

reasonable care ought to have known, that there was a condition of the floor where the plaintiff fell which should have been taken care of."

It may be here noted that the court distinguishes the Wetmore cases from that of Blake vs. Great Atlantic and Pacific Tea Co., 266 Mass. 12, 164 N. E. 486 cited to us and relied on here by the plaintiff.

There was no proof in the case at bar that the floor dressing used by the defendant was oily or that the owner of the store knew or in the exercise of reasonable care ought to have known, that there was an oily, slippery spot at the place where plaintiff fell. There is no testimony as to how long that spot had remained upon the floor before plaintiff slipped in it. The defendant did know, of course, that customers were constantly tracking in wet snow and slush but as before stated, it had taken every reasonable precaution to guard against that condition. The proof is clear that the floor dressing Myco-Sheen possesses a light amber tint, is transparent and will not stain clothing; that if placed on clothes it "gradually disappears; fades out".

It will be remembered that the plaintiff herein, her husband and another witness testified that plaintiff's coat and dress were stained by the spot of liquid six or eight inches long in which she slipped. When asked to state the component parts of Myco-Sheen the representative of the manufacturer of the product testified that it was composed of "solvents and gums"; that "the solvent is a cleaner. It cleans the floor and acts as a conveyer to convey the gums into the pores of the wood". Webster's New International Dictionary in defining the term "oil" states that it is "any of a large class of unctuous, combustible substances which are liquid or least easily liquefiable on warming and soluble in ether but not in water. They are usually lighter that

water and soluble also in alcohol. They leave a greasy stain (not always permanent) on paper, cloth, etc.".

It is significant that plaintiff's counsel did not directly ask the manufacturer's representative aforesaid when he was on the witness stand whether Myco-Sheen contained oil. However, when asked on cross examination whether Myco-Sheen was "about the color of light oil", the representative replied that "it has a more amber tint to it than oil does".

Under the authorities reviewed and cited above, it is not apparent to us that sufficient evidence was presented to enable the jury to properly find that the defendant was guilty of negligence in the maintenance of the floor on which plaintiff slipped and fell.

Respondent insists that the certificate of the clerk of the district court to the record in this case is deficient. We do not think so. The certificate states over the signature and seal of the clerk of the court that the record is "true and correct". That complies with the statutory provision. See 1 Wyoming Compiled Statutes, 1945, Section 3-5406.

The respondent has submitted a motion to dismiss this case for failure on appellant's part to comply with our Rule 37 requiring the preparation of abstracts of record. This motion was argued by counsel for both parties in connection with the points involving the merits of the action. There is no doubt that the abstract of the record filed by the appellant in this case is seriously deficient in not obeying the requirements of the rule aforesaid. In many places it is hardly more than an index to the record. Neither the specifications of error nor the instructions of the court are presented in such a way that the court can take the abstract "and examine it and from it determine the merits of the case". See Wyodak Chemical Co. vs. Board of Land

Commissioners, 51 Wyo. 265, 65 Pac. 2d 1103; St. Clair vs. St. Clair, 46 Wyo. 446, 28 Pac. 2d 894; Harris vs. Schoonmaker, 50 Wyo. 119, 143, 58 Pac. 2d 415, 60 Pac. 2d 360.

As said many times before, we much prefer to dispose of a case on its merits but we have in times past on small records examined the original and determined its merits from that. See last two cases cited supra. We have done so in this case in order to reach a result which we think consonant with justice and the right of the matter. However, we can not overlook the disregard of the rule above mentioned on the part of the appellant. It has been in force altogether too long for counsel to be unfamiliar with its requirements as well as our decisions in connection with it. Though the motion to dismiss was filed several months before the case was set down for oral argument and submission, no attempt was made to supply the abstract's deficiencies, some of which we have hereinabove mentioned.

An order should be entered, therefore, reversing the judgment below but denying appellant any costs on this appeal. Brewer vs. Folsom Bros. Co., 43 Wyo. 433, 5 Pac. 2d 283. Other questions have been presented by the briefs of the parties and arguments, but we think sufficient has been said above to dispose of the case at this time without extending further this opinion.

*Reversed Without Costs.*

KIMBALL, J., and BLUME, C., concur.